**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| RYAN WOOD, derivatively on behalf of BAXTER INTERNATIONAL INC.,<br><br>Plaintiff,<br><br>vs.<br><br>JOSE E. ALMEIDA, BRENT SHAFER, JOEL T. GRADE, JAMES K. SACCARO, BRIAN STEVENS, HEATHER KNIGHT, CLARE TRACHTMAN, WILLIAM A. AMPOFO, II, PATRICIA B. MORRISON, STEPHEN N. OESTERLE, STEPHEN H. RUSCKOWSKI, NANCY M. SCHLICHTING, CATHY R. SMITH, AMY A. WENDELL, DAVID S. WILKES, and PETER M. WILVER,<br><br>Defendants,<br><br>and<br><br>BAXTER INTERNATIONAL INC.,<br><br>Nominal Defendant. | Case No.: 1:25-cv-13966<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR:**<br><br>**(1) VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934;**<br>**(2) BREACH OF FIDUCIARY DUTY;**<br>**(3) UNJUST ENRICHMENT;**<br>**(4) ABUSE OF CONTROL;**<br>**(5) GROSS MISMANAGEMENT; AND**<br>**(6) WASTE OF CORPORATE ASSETS**<br><br>JURY TRIAL DEMANDED |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Ryan Wood ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Baxter International Inc. ("Baxter" or the "Company"), files this Verified Shareholder Derivative Complaint against individual defendants Jose E. Almeida ("Almeida"), Brent Shafer ("Shafer"), Joel T. Grade ("Grade"), James K. Saccaro ("Saccaro"), Brian Stevens ("Stevens"), Heather Knight ("Knight"), Clare Trachtman ("Trachtman"), William

A. Ampofo, II ("Ampofo"), Patricia B. Morrison ("Morrison"), Stephen N. Oesterle ("Oesterle"), Stephen H. Rusckowski ("Rusckowski"), Nancy M. Schlichting ("Schlichting"), Cathy R. Smith ("Smith"), Amy A. Wendell ("Wendell"), David S. Wilkes ("Wilkes"), and Peter M. Wilver ("Wilver") (collectively, the "Individual Defendants," and together with Baxter, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Baxter, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of Sections 14(a), 10(b), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and for contribution against Defendants Almeida, Shafer, Grade, Saccaro, Stevens, Knight, and Trachtman under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Baxter, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative action that seeks to remedy wrongdoing committed by Baxter's directors and officers from February 23, 2022 to July 30, 2025, inclusive (the "Relevant Period").

2. Baxter is a Delaware corporation headquartered in Deerfield, Illinois chiefly engaged in the manufacture and sale of healthcare products, including, but not limited to: inhaled

anesthetics, advanced surgical equipment, and respiratory health devices. The Company's products are utilized under a wide array of healthcare environments such as hospitals, nursing homes, and rehabilitation centers. As of December 31, 2024, the Company manufactured products in over 20 countries and sold products in over 100 countries.

3. The Company's operations consist of three reportable segments: Medical Products & Therapies, Healthcare Systems & Technologies, and Pharmaceuticals. One of Baxter's more recent product launches was the Novum IQ Large Volume Pump ("Novum LVP"), which was designed to control the delivery of intravenous ("IV") fluids to patients, such as blood, nutrients, and medications. The Company first began selling the Novum LVP in Canada in late 2020 following Canadian marketing authorization. Baxter later began selling the Novum LVP in the United States in April 2024 after the FDA granted sale clearance on the product.

4. Throughout the Relevant Period, the Individual Defendants failed to disclose the existence and gravity of product defects in the Novum LVP and the negative impact such defects would have on the Company's financial and operational prospects. Moreover, the Individual Defendants continuously reassured investors of the quality and the stability of the Novum LVP despite being aware of the safety risks associated with the device.

5. For example, on September 7, 2023, Defendant Almeida represented the Company at the Wells Fargo Securities Healthcare Conference (the "Wells Fargo Conference"). At the Wells Fargo Conference, Defendant Almeida stated, with regard to the Novum LVP, that "***[w]e have remained optimistic on the pump. It's a great pump, works today. It's working on the market today***."[1]

6. The truth would not begin to emerge until April 7, 2025, when a local news outlet

---

[1] Unless otherwise stated, all emphasis is added.

in Missouri reported on a whistleblower at a major hospital system based in St. Louis, who noted substantial safety concerns with the Novum LVP. Notably, the St. Louis-based hospital system removed its stock of Novum LVPs from service following the news report. On April 24, 2025, the Company sent its first warning letter to customers concerning the risks associated with the Novum LVP. Subsequently, the Company sent a second warning letter to customers concerning the Novum LVP on July 14, 2025. Additionally, the U.S. Food and Drug Administration ("FDA") moved to designate the problems associated with the Novum LVP as a Class I recall. Still, despite this partial emergence of the truth, Defendants continued to mislead investors with respect to the severity of the Product Safety Misconduct and the resulting impact on the Company's sales prospects.

7. The truth fully emerged on July 31, 2025 when the Company issued a press release concerning the Novum LVP which it also filed as a current report on Form 8-K with the SEC that same day (the "July 2025 Press Release"). The July 2025 Press Release announced that the Company would "***voluntarily and temporarily pause shipments and planned installations of the Novum LVP***" and further reported that it was "unable to currently commit to an exact timing for resuming shipment and installation for Novum LVPs."

8. On this news, the price per share of Baxter stock fell $6.29, or roughly 22.4%, from a closing price of $28.05 per share on July 30, 2025 to close at $21.76 per share on July 31, 2025.

9. In breach of their fiduciary duties, the Individual Defendants caused and/or permitted Baxter to sell products which they knew, or were highly reckless in not knowing, were unsafe. Specifically: (1) the Novum LVP featured significant design defects which resulted in product failures such as over infusion, under infusion, and non-delivery of fluids; (2) the design defects present in the Novum LVP exposed patients to serious injury or death; (3) the Company was notified of the defects in the Novum LVP, in addition to injuries and deaths linked to the

product; and (4) the Company's use of customer alerts to address the defects in the Novum LVP was an inadequate remedy, as such defects continued to be present notwithstanding the alerts (collectively, the "Product Safety Misconduct").

10. In addition, during the Relevant Period, the Individual Defendants, in breach of their fiduciary duties owed to Baxter, willfully or recklessly made and/or caused the Company to make false and misleading statements. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) Baxter was engaging in the Product Safety Misconduct; (2) in light of the Company's inadequate remedial measures to address the Product Safety Misconduct, there was an increased likelihood that customers would stop using the Novum LVPs on patients; (3) as a result, the Company would halt the sale of the Novum LVP; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

11. The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

12. In addition, during the Relevant Period, five of the Individual Defendants breached their fiduciary duties by engaging in lucrative insider trading while the Company's stock was artificially inflated as a result of the Individual Defendants' false and misleading statements discussed herein, reaping combined total proceeds of approximately $3.6 million.

13. Moreover, the Individual Defendants caused the Company substantial harm by causing it to repurchase its own shares at artificially inflated prices. In total, the Company spent an aggregate amount of approximately $32.4 million to repurchase 500,000 shares of its own

common stock at artificially inflated prices from February 2022 to July 2025. In total, this caused the Company to overpay for repurchases of its own stock by over $21.5 million.

14. In light of the Individual Defendants' misconduct—which has subjected the Company; its former President, Chief Executive Officer ("CEO") and Chairman of the Board; its interim CEO and Chairman of the Board; its Chief Financial Officer ("CFO"); its former interim CFO, Senior Vice President, and Chief Accounting Officer ("CAO"); its former CFO; its former Chief Operating Officer ("COO"); and its Vice President of Investor Relations to a federal securities fraud class action lawsuit pending in this Court (the "Securities Class Action") and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

15. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

16. In light of the breaches of fiduciary duty engaged in by the Individual Defendants, the majority of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of numerous of the Individual Defendants' liability in the Securities Class Action, of the substantial likelihood of the directors' liability in this derivative action, and of their not being disinterested or independent directors, a majority of the Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

17. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, Sections 10(b) and 20(a) of the Exchange Act (15. U.S.C. § 78j(b), 78t(a) and 78t-1), and SEC Rule 10b-5 (17 C.F.R. §240.10b-5) promulgated thereunder, and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

18. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

19. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

20. Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either resides or maintains executive offices in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

21. Plaintiff is a current shareholder of Baxter. Plaintiff has continuously held Baxter stock at all relevant times.

### Nominal Defendant Baxter

22. Baxter is a Delaware corporation with its principal executive offices at One Baxter Parkway, Deerfield, Illinois 60015. Baxter's shares trade on the New York Stock Exchange ("NYSE") under the ticker symbol "BAX."

**Defendant Almeida**

23. Defendant Almeida served as the Company's President, CEO, and Chairman of the Board from January 1, 2016 to February 3, 2025.

24. During the Relevant Period, while the Company's stock price was artificially inflated and before the schemes were exposed, Defendant Almeida made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| February 13, 2023 | 10,053 | $40.40 | $406,141 |
| March 2, 2023 | 4,642 | $39.62 | $183,916 |
| February 12, 2024 | 10,863 | $40.31 | $437,888 |
| March 1, 2024 | 9,701 | $41.01 | $397,838 |
| March 4, 2024 | 4,779 | $42.50 | $203,108 |
| December 13, 2024 | 5,966 | $30.32 | $180,889 |

Thus, in total, before the fraud was exposed, he sold 46,004 shares of Company stock on inside information, for which he received approximately $1.8 million in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the schemes.

25. The Company's Schedule 14A filed with the SEC on March 25, 2024 (the "2024 Proxy Statement") stated the following about Defendant Almeida:

> Mr. Almeida has been the Chair, President and CEO of Baxter since January 1, 2016. He began serving as an executive officer of the company in October 2015. Prior to joining Baxter, he served as Senior Advisor with The Carlyle Group, a multinational private equity, alternative asset management and financial services corporation, from May 2015 to October 2015. Previously, he served as the Chair, President and Chief Executive Officer of Covidien plc (Covidien), a global healthcare products company, from March 2012 through January 2015, prior to the acquisition of Covidien by Medtronic plc (Medtronic), and President and Chief Executive Officer of Covidien from July 2011 to March 2012. Mr. Almeida currently serves as a director of Bank of America. Mr. Almeida previously served as a member of the Board of Directors of Walgreens Boots Alliance, Inc. from 2017 to 2022, Partners in Health from 2013 to 2021 and Ortho-Clinical Diagnostics, Inc. from 2015 to 2020.

> **Key Attributes, Experience and Skills**
> Substantial knowledge of the medical device industry and extensive experience leading, operating and transforming global corporations as a result of his roles as Chair, President and CEO of Baxter and Covidien and in other senior management roles at other medical device companies.

**Defendant Shafer**

26. Defendant Shafer has served as a Company director since May 10, 2022. Additionally, Defendant Shafer has served as the Chairman of the Board since May 3, 2022 and served as the Company's interim CEO from February 3, 2025 to September 3, 2025.

27. The Schedule 14A the Company filed with the SEC on March 25, 2025 (the "2025 Proxy Statement") stated the following about Defendant Shafer:

> Mr. Shafer became Baxter's Chair of the Board and Interim CEO on February 3, 2025, in connection with Mr. Almeida's departure. He is the former Chair and Chief Executive Officer of Cerner Corporation (Cerner), a leading provider of various health information technologies, ranging from medical devices to electronic health records to hardware, serving in this role from 2018 to 2021. Prior to Cerner, Mr. Shafer held a number of roles at Philips, including Chief Executive Officer of Philips North America. Mr. Shafer was also the Chief Executive Officer of Philips Home Healthcare Solution business. Before joining Philips, Mr. Shafer was Vice President and General Manager of Hillrom's Patient Care Environment Division and worked at GE Medical Systems where he served in key positions in sales, marketing, and general management. Mr. Shafer has also held senior roles at Hewlett Packard's Medical Products Group and Johnson & Johnson. Mr. Shafer currently serves as a director of Tactile Systems Technology, Inc. and Veracyte, Inc.
>
> **Key Attributes, Experience, and Skills**
> Substantial knowledge of the health IT industry and extensive experience leading, operating and transforming global corporations (including with the build out of digital health capabilities) as a result of his roles as Chair and Chief Executive Officer at Cerner and key roles at Philips and in other senior management roles at other medical device companies (including Hillrom).

**Defendant Grade**

28. Defendant Grade has served as the Company's Executive Vice President and CFO since October 18, 2023. Defendant Grade also served as the Company's interim CAO from

September 3, 2024 to February 21, 2025.

29. During the Relevant Period, while the Company's stock price was artificially inflated and before the schemes were exposed, Defendant Grade made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| December 2, 2024 | 6,612 | $33.55 | $221,833 |
| March 6, 2025 | 4,306 | $35.44 | $152,605 |

Thus, in total, before the fraud was exposed, he sold 10,918 shares of Company stock on inside information, for which he received approximately $374,437 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the schemes.

30. The Company's website stated the following about Defendant Grade:[2]

> Grade joined Baxter in 2023 following a 25-year career with Sysco, the world's global foodservice leader. He most recently served as Sysco's executive vice president, corporate development. His previous roles included executive vice president and chief financial officer, senior vice president of finance and chief accounting officer, and senior vice president of foodservice operations.
>
> Grade earned his bachelor's degree in accounting and finance with a specialization in international business from the University of Wisconsin-Madison, and a master's degree in business administration in finance, strategy and marketing from Northwestern University's Kellogg School of Management.

**Defendant Saccaro**

31. Defendant Saccaro served as the Company's Vice President and CFO from June 30, 2015 to May 31, 2023.

32. During the Relevant Period, while the Company's stock price was artificially inflated and before the schemes were exposed, Defendant Saccaro made the following sales of Company stock:

[2] https://www.baxter.com/our-story/our-leadership/joel-grade

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| February 13, 2023 | 1,059 | $40.50 | $42,890 |
| March 2, 2023 | 1,061 | $39.62 | $42,037 |

Thus, in total, before the fraud was exposed, he sold 2,120 shares of Company stock on inside information, for which he received approximately $84,926 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the schemes.

33. The Company's website stated the following about Defendant Saccaro:[3]

> Saccaro was senior vice president and chief financial officer at Hill-Rom Corporation prior to rejoining Baxter in 2014. He served as corporate vice president and treasurer of Baxter from 2011 to 2013. He originally joined the company in 2002 as manager of strategy for the company's BioScience business, and over the years assumed positions of increasing responsibility, including vice president of financial planning, and vice president of finance for the company's operations in Europe, Middle East and Africa. He previously held strategy and business development positions at Clear Channel Communications and the Walt Disney Company.
>
> Saccaro also serves as executive sponsor of Baxter Equality Network, a business resource group for employees dedicated to supporting inclusion of lesbian, gay, bisexual and transgender professionals and their straight allies at Baxter.
>
> He received a bachelor's degree in economics and master's degree in engineering-economic systems from Stanford University.

**Defendant Stevens**

34. Defendant Stevens served as the Company's interim CFO from May 31, 2023 to October 18, 2023. Defendant Stevens also served as the Company's Senior Vice President and CAO from 2018 to September 3, 2024.

[3] https://www.baxter.com.tr/en/our-story/baxter-leadership/james-jay-saccaro

35. During the Relevant Period, while the Company's stock price was artificially inflated and before the schemes were exposed, Defendant Stevens made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| February 28, 2022 | 2,325 | $85.46 | $198,695 |
| February 28, 2022 | 175 | $86.07 | $15,602 |
| February 28, 2022 | 172 | $84.97 | $14,615 |
| March 3, 2022 | 172 | $85.19 | $14,653 |
| March 21, 2022 | 157 | $79.05 | $12,411 |
| February 13, 2023 | 224 | $40.50 | $9,072 |
| March 2, 2023 | 418 | $39.62 | $16,561 |
| March 3, 2023 | 184 | $39.94 | $7,349 |
| March 20, 2023 | 161 | $38.19 | $6,149 |
| February 12, 2024 | 284 | $40.31 | $11,448 |
| March 1, 2024 | 673 | $41.01 | $27,600 |
| March 4, 2024 | 545 | $42.50 | $23,163 |

Thus, in total, before the fraud was exposed, he sold 5,490 shares of Company stock on inside information, for which he received approximately $356,776 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the schemes.

36. The Company's website stated the following about Defendant Stevens:[4]

> Stevens joined Baxter in 2018 from Groupon, Inc., where he most recently served as treasurer and chief accounting officer. He had served as Groupon's chief accounting officer from 2012 to 2016 before assuming the treasurer role. Prior to joining Groupon, Stevens spent 16 years with KPMG LLP, most recently as a partner. He spent five years in KPMG's Department of Professional Practice and was a practice fellow at the Financial Accounting Standards Board from 2006 to 2008.
>
> Stevens received his bachelor of science degree in accountancy from the University of Illinois at Urbana-Champaign and is a licensed certified public accountant in Illinois and New York. He is a member of the American Institute of Certified Public Accountants and served on its Financial Reporting Executive Committee

[4] https://www.baxter.com.tr/en/our-story/baxter-leadership/brian-stevens

from 2013 to 2018.

**Defendant Knight**

37. Defendant Knight served as the Company's Executive Vice President and COO from February 3, 2025 to October 9, 2025.

38. During the Relevant Period, while the Company's stock price was artificially inflated and before the schemes were exposed, Defendant Knight made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| March 2, 2023 | 1,067 | $39.62 | $42,275 |
| March 3, 2023 | 220 | $39.94 | $8,787 |
| March 20, 2023 | 212 | $38.19 | $8,096 |
| February 12, 2024 | 356 | $40.31 | $14,350 |
| March 1, 2024 | 2,154 | $41.01 | $88,336 |
| March 4, 2024 | 1,320 | $42.50 | $56,100 |
| December 2, 2024 | 6,041 | $33.55 | $202,676 |
| March 3, 2025 | 3,344 | $34.86 | $116,572 |
| March 6, 2025 | 13,634 | $35.44 | $483,189 |

Thus, in total, before the fraud was exposed, she sold 28,348 shares of Company stock on inside information, for which she received approximately $1 million in proceeds. Her insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate her motive in facilitating and participating in the schemes.

39. The Company's website stated the following about Defendant Knight:[5]

> Knight joined Baxter in 2019 from Medtronic plc, where she most recently served as vice president/general manager of the global gynecologic health, colorectal health and hernia businesses. Knight has more than 25 years of experience across the pharmaceutical and medical device industries in roles of increasing responsibility. Prior to joining Medtronic, she held key commercial leadership positions at Kendall Healthcare, Tyco Healthcare and Covidien plc.

[5] https://mea.baxter.com/en/our-story/our-leadership/heather-knight

Knight received her bachelor's degree in biology from the University of Buffalo.

**Defendant Trachtman**

40. Defendant Trachtman has served as the Company's Vice President of Investor Relations since 2015.

41. The Company's website stated the following about Defendant Trachtman:[6]

> Trachtman has served in this role since 2015. Previously, she has served in roles of increasing responsibility within Baxter's investor relations function since joining Baxter in 2000.
>
> She received a bachelor's degree in accounting from the University of Notre Dame.

**Defendant Ampofo**

42. Defendant Ampofo has served as a Company director since June 29, 2023. Defendant Ampofo also serves as a member of the Quality and Regulatory Compliance Committee and as a member of the Operating Committee.

43. The 2025 Proxy Statement stated the following about Defendant Ampofo:

> Mr. Ampofo has worked for Boeing Company (Boeing), a leading global aerospace company, since 2016 and currently serves as Chair, Supply Chain Operations Council and Senior Vice President, Parts & Distribution Services and Supply Chain function for Boeing Global Services. Prior to joining Boeing, he spent 22 years at United Technologies Corporation (which later merged with Raytheon Company to form Raytheon Technologies), a multinational conglomerate which researched, developed, and manufactured products, including aircraft engines, aerospace systems, among other industrial products, working in roles of increasing responsibility related to finance, IT, corporate strategy and operations. Mr. Ampofo currently serves as a member of the board of trustees of The Episcopal School of Dallas.
>
> **Key Attributes, Experience and Skills**
> Extensive experience leading global organizations as a result of his role as Chair, Supply Chain Operations Council and Senior Vice President, Parts & Distribution Services and Supply Chain function at Boeing and his 22 years of finance, operational, IT and corporate strategy experience at United Technologies Corporation.

---

[6] https://www.baxter.com.tr/en/our-story/baxter-leadership/clare-trachtman

**Defendant Morrison**

44. Defendant Morrison has served as a Company director since 2019. Defendant Morrison currently serves as a member of the Audit Committee, as a member of the Nominating, Corporate Governance and Public Policy Committee, and as a member of the Operating Committee.

45. The 2025 Proxy Statement stated the following about Defendant Morrison:

> From 2009 to 2018, Ms. Morrison served as Executive Vice President, Customer Support Services and Chief Information Officer (CIO), of Cardinal Health Inc. (Cardinal), a global, integrated healthcare services and products company. At Cardinal, she led global IT operations, which included the transformation of multiple business segments, acquisition integration and digital strategy. Prior to Cardinal, Ms. Morrison was the Chief Executive Officer of Mainstay Partners, a technology advisory firm, from 2008 to 2009. She previously served as CIO of both Motorola, Inc. and Office Depot, Inc. and held senior-level IT positions at General Electric Company, PepsiCo, Inc., The Procter & Gamble Company and The Quaker Oats Company. She previously served as a director of Splunk Inc. and Virtusa Corporation.
>
> **Key Attributes, Experience and Skills**
> Extensive experience across diverse global industries overseeing strategic, operational and financial aspects of IT, including cybersecurity, global IT master planning, digital transformation and human capital matters, including in the medical products industry, as a result of her experience leading the IT function at large, multinational organizations.

**Defendant Oesterle**

46. Defendant Oesterle has served as a Company director since 2017 and currently serves as the Chair of the Quality and Regulatory Compliance Committee. Defendant Oesterle also currently serves as a member of the Nominating, Corporate Governance and Public Policy Committee.

47. The 2025 Proxy Statement stated the following about Defendant Oesterle:

> Dr. Oesterle is a consultant, advising private equity and operating companies in the healthcare industry. From 2002 to 2015, he was a member of the Executive Committee of Medtronic, a global medical technology, services and solutions company, serving as Medtronic's Senior Vice President, Medicine and Technology.

> Previously, he served as an Associate Professor of Medicine and Director of Invasive Cardiology Services at each of Massachusetts General Hospital (1998 to 2002), Stanford University Medical Center (1992 to 1998) and Georgetown University Medical Center (1991 to 1992). Dr. Oesterle currently serves as a director of Paragon 28 and Peijia Medical Ltd. He previously served as a director of Sigilon Therapeutics, Inc., Montes Archimedes Acquisition Corp. and REVA Medical, Inc.
>
> **Key Attributes, Experience and Skills**
> Extensive experience in the medical products and healthcare industries with a strong scientific and medical background and significant experience advising on strategic transactions. Substantial knowledge of the medical device industry and extensive medical and leadership experience as a result of his role as Senior Vice President, Medicine and Technology at Medtronic and as a director at various healthcare companies as well as positions held at Harvard Medical School, Stanford University Medical Center and other leading hospitals.

**Defendant Rusckowski**

48. Defendant Rusckowski has served as a Company director since August 21, 2023 and currently serves as the Chair of the Operating Committee. Defendant Rusckowski also currently serves as a member of the Compensation and Human Capital Committee and as a member of the Quality and Regulatory Compliance Committee.

49. The 2025 Proxy Statement stated the following about Defendant Rusckowski:

> Mr. Rusckowski is the former Chief Executive Officer and President of Quest Diagnostics, Inc. (Quest), a leading provider of diagnostic information services, a position he held from 2012 until 2022. He also served as Chair of the Board of Quest from January 2017 through March 2023. Prior to joining Quest, he served as the Chief Executive Officer of Philips Healthcare (Philips), a health technology company focused on improving people's health across the health continuum, and a member of the Board of Management of Royal Philips Electronics. Earlier in his career, he held roles of increasing responsibility at Hewlett-Packard Company, a manufacturer of software and computer services, and Procter & Gamble Company, a leading company that produces and sells products for the home, health and personal care. Mr. Rusckowski currently serves on the supervisory board of Qiagen Inc. and as a director of Tenet Healthcare Corporation and previously served as a director of MedQuist, Inc. and Quest.
>
> **Key Attributes, Experience and Skills**
> Extensive leadership experience in the healthcare industry, including in strategic planning, international operations and strategic transactions (including with the build out of digital health capabilities) with multinational corporations.

**Defendant Schlichting**

50. Defendant Schlichting has served as a Company director since 2021 and currently serves as the Chair of the Compensation and Human Capital Committee. Defendant Schlichting also currently serves as a member of the Quality and Regulatory Compliance Committee.

51. The 2025 Proxy Statement stated the following about Defendant Schlichting:

> Ms. Schlichting became Baxter's Lead Independent Director effective February 3, 2025. She joined the Board in 2021 following Baxter's acquisition of Hill-Rom Holdings, Inc. (Hillrom), where she had previously served as a director and Chair of its Compensation and Management Development Committee. Ms. Schlichting is the retired President and Chief Executive Officer of Henry Ford Health System (HFHS) in Detroit, Michigan, a non-profit healthcare organization, serving in this role from June 2003 to January 2017. She joined HFHS in 1998 as Senior Vice President and Chief Administrative Officer and served as Executive Vice President and Chief Operating Officer from 1999 to 2003 and as President and Chief Executive Officer of Henry Ford Hospital from 2001 to 2003. She currently serves as a director of Encompass Health, Inc. and Walgreens Boots Alliance, and as a trustee of the Duke University and as the chair of the Duke University Health System Board. She previously served as a director of Pear Therapeutics, Inc. and as a trustee of the Kresge Foundation.
>
> **Key Attributes, Experience and Skills**
> Extensive healthcare administration (including human capital management) experience that spans more than 35 years in senior-level executive roles. This experience includes leading HFHS through a financial turnaround and leading various customer service, quality and human capital management initiatives. Extensive expertise in quality and regulatory management, mergers and acquisitions, including public company mergers and acquisitions such as the global mergers of Baxter and Hillrom and Walgreens with Alliance Boots.

**Defendant Smith**

52. Defendant Smith has served as a Company director since 2017 and currently serves as the Chair of the Nominating, Corporate Governance and Public Policy Committee. Defendant Smith also currently serves as a member of the Audit Committee.

53. The 2025 Proxy Statement stated the following about Defendant Smith:

> Ms. Smith was recently appointed as Executive Vice President and Chief Financial Officer at Starbucks Corporation (Starbucks), a global beverage company. Previously she served as Chief Financial Officer of Nordstrom, Inc. (Nordstrom),

a luxury department store chain, from May 2023 to March 2025. Prior to Nordstrom, she served as Chief Financial and Administrative Officer of Bright Health, a diversified consumer-focused healthcare company, from January 2020 to May 2023. Prior to Bright Health, Ms. Smith was Executive Vice President and Chief Financial Officer at Target Corporation (Target) from September 2015 to November 2019. Prior to joining Target in 2015, Ms. Smith served as Executive Vice President and Chief Financial Officer at Express Scripts Holding Company (Express Scripts), an independent pharmacy benefits management company, from 2014 to 2015, and at Walmart International (Walmart), a division of Walmart Stores Inc., from 2010 to 2014. Earlier in her career, she served as Chief Financial Officer at GameStop. Ms. Smith currently serves as a director of PPG Industries, Inc.

**Key Attributes, Experience and Skills**
Significant financial expertise and corporate leadership experience as a result of her senior positions held at Starbucks, Nordstrom, Bright Health, Target, Express Scripts and Walmart. This experience includes work helping to oversee cybersecurity incident response and various strategic transactions as well as human capital management expertise as the Chief Administrative Officer at Bright Health.

**Defendant Wendell**

54. Defendant Wendell has served as a Company director since 2019 and currently serves as a member of the Compensation and Human Capital Committee. Defendant Wendell also currently serves as a member of the Quality and Regulatory Compliance Committee and as a member of the Operating Committee.

55. The 2025 Proxy Statement stated the following about Defendant Wendell:

Ms. Wendell served as Senior Advisor at Perella Weinberg Partners L.P., a global financial services firm, from January 2016 to May 2019 where she consulted on strategy, corporate finance and investing practices in the healthcare industry. From 2015 to September 2018, Ms. Wendell served as a Senior Advisor at McKinsey & Company (McKinsey), a management consulting firm, in its strategy and corporate finance practice and also served as a member of McKinsey's Transactions Advisory Board. She previously served as Senior Vice President of Strategy and Business Development and Licensing at Covidien plc (Covidien) from 2006 to 2015, where she led the company's strategy and portfolio management initiatives and managed business development activities. From 1986 to 2015, Ms. Wendell held roles of increasing responsibility at Covidien (including its predecessors, Tyco International plc and Kendall Healthcare Products Company), from engineering to product management and business development. Ms. Wendell currently serves as a director of Axogen, Inc., Hologic, Inc. and Solventum Corporation. Ms. Wendell previously served as a director of Por Cristo, a non-profit charitable medical service organization involved in healthcare work for at-risk women and children in Latin

> America.
>
> **Key Attributes, Experience and Skills**
> Extensive expertise in the healthcare sector in the areas of global business development and licensing, portfolio management, mergers and acquisitions, resource allocation and identifying new market opportunities, as well as significant restructuring and integration experience, including as a result of her roles at Covidien and its predecessors.

**<u>Defendant Wilkes</u>**

56. Defendant Wilkes has served as a Company director since 2021 and currently serves as a member of the Nominating, Corporate Governance and Public Policy Committee. Defendant Wilkes also currently serves as a member of the Quality and Regulatory Compliance Committee.

57. The 2025 Proxy Statement stated the following about Defendant Wilkes:

> Dr. Wilkes served as Dean of the University of Virginia School of Medicine from 2015 to 2021 and currently serves as Dean Emeritus. He previously served in positions of increasing responsibility at Indiana University School of Medicine, most recently as the Executive Associate Director for Research Affairs and as the August M. Watanabe Professor of Medical Research between 2009 and 2015. Dr. Wilkes is the co-founder of ImmuneWorks Inc. (ImmuneWorks), a biotechnology start-up company, and has served as its Chief Scientific Officer since 2005. Since 2006, he has served as the National Director of the Harold Amos Medical Faculty Development Program of the Robert Wood Johnson Foundation. Dr. Wilkes is a military veteran, having served three years as a major in the U.S. Air Force Medical Corps. In 2020, he was elected to the National Academy of Medicine. Dr. Wilkes previously served as a director of Syneos Health.
>
> **Key Attributes, Experience and Skills**
> Extensive experience with, and medical and scientific expertise and knowledge of, the healthcare industry and its providers as a result of his positions with the University of Virginia School of Medicine and the Indiana University School of Medicine, as well as related leadership experience, including in connection with in forming and advising ImmuneWorks.

**<u>Defendant Wilver</u>**

58. Defendant Wilver served as a Company director from May 10, 2022 to December 31, 2024.

59. The 2024 Proxy Statement stated the following about Defendant Wilver:

> Mr. Wilver served as Executive Vice President and Chief Administrative Officer of Thermo Fisher, a world leader and supplier of scientific instrumentation, reagents and consumables and services and software, from 2015 until he retired in 2017. He previously served as the Chief Financial Officer at Thermo Fisher from 2004 to 2015. Prior to Thermo Fisher, Mr. Wilver was the Chief Financial Officer of Honeywell's Electronic Materials Division (Honeywell), a multinational conglomerate corporation. Before joining Honeywell, Mr. Wilver held various finance roles at Grimes Aerospace Company, a manufacturer of aircraft lighting systems, and General Electric Company, a multinational company in the power, aviation and healthcare sectors. Mr. Wilver currently serves as a director of Livanova PLC and Shoals Technologies Group, Inc. and previously served as a director of Evoqua Water Technologies Corp., CIRCOR International, and Tenet Healthcare Corporation.
>
> **Key Attributes, Experience and Skills**
> Substantial experience leading and operating large, complex corporations and significant financial and global manufacturing and supply chain expertise through his leadership roles with Thermo Fisher and Honeywell, as well as through positions at Grimes Aerospace Company and General Electric Company.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

60. By reason of their positions as officers and/or directors of Baxter and because of their ability to control the business and corporate affairs of Baxter, the Individual Defendants owed Baxter and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Baxter in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Baxter and its shareholders so as to benefit all shareholders equally.

61. Each officer and director of the Company owes to Baxter and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

62. The Individual Defendants, because of their positions of control and authority as officers and/or directors of Baxter, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

63. To discharge their duties, officers and directors of Baxter were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

64. Each Individual Defendant, by virtue of his or her position as an officer and/or director, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officer and directors of Baxter, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Baxter's Board at all relevant times.

65. As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock

would be based upon truthful and accurate information.

66. To discharge their duties, the officers and directors of Baxter were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Baxter were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Illinois, and the United States, and pursuant to Baxter's own Code of Conduct;

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how Baxter conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of Baxter and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Baxter's operations would comply with all applicable laws and Baxter's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f) exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h) examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

67. Each of the Individual Defendants further owed to Baxter and the shareholders the duty of loyalty requiring that each favor Baxter's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

68. At all times relevant hereto, the Individual Defendants were the agents of each other and of Baxter and were at all times acting within the course and scope of such agency.

69. Because of their advisory, executive, managerial, and directorial positions with Baxter, each of the Individual Defendants had access to adverse, non-public information about the Company.

70. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Baxter.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

71. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants

caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and assisted each other in breaching their respective duties.

72. The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, unjust enrichment, and violations of the Exchange Act.

73. The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Baxter was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

74. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

75. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Baxter and was at all times acting within the course and scope of such agency.

## BAXTER'S CODE OF CONDUCT

76. The Company's Code of Conduct (the "Code of Conduct") states that "[e]thical business conduct is a part of everyone's job[,]" and that employees must "[u]understand and comply with all of the Code of Conduct standards that apply to [their] work at Baxter."

77. In a section titled "Accurate Business Records," the Code of Conduct states, in relevant part, that:

> Baxter employees must record information accurately and completely and in accordance with Baxter requirements. Original data (the result of an original observation and activity) must be recorded exactly as it was first observed and cannot be rounded (outside of specifications), guessed at, or altered in any way. Special care should be taken with the following records, whether paper or electronic records:
>
> ✜ Financial records, including financial statements, accounting entries, and supporting detail information;
>
> ✜ Manufacturing and research records, including production data, quality records, and research test results;
>
> ✜ Records filed with or required by government agencies; and
>
> ✜ Other business-related records including time records and business expenses.
>
> RECORD MANAGEMENT
> The preservation of records is necessary to run our business. The routine removal of records that are no longer needed improves our operation.
>
> To ensure appropriate record management, each Baxter employee must:
>
> ✜ Maintain records in accordance with the applicable record management policy or quality system for his or her business, region, or function;
>
> ✜ Review documents under his or her control at least annually to ensure that unnecessary records are not being created or retained; and
>
> ✜ Preserve all documents pertaining to pending or anticipated litigation and governmental audits or investigations.

78. In a section titled "Life Science Ethics," the Code of Conduct states, in relevant

part, that:

> Baxter's expertise in medical product development is a critical part of our mission to save and sustain lives. Baxter also recognizes that we must carefully consider the risks and benefits to patients and society prior to making any decision to commercialize a medical product or therapy. Research performed by Baxter or at the direction of Baxter must:
>
> ✣ Comply with applicable law, regulations, and accepted ethical and professional standards;
>
> ✣ Protect the life, health, privacy, and dignity of those participating in clinical trials; and
>
> ✣ Minimize the use of animals in our research to the extent possible, and support the conscientious use and highest standards of animal care in research when no other valid scientific alternative exists.

79. The Code of Conduct provides, in a section titled "Protecting Patients and Producing Quality Products," that:

> Delivering safe and effective life-sustaining products to patients is the most critical aspect of our work. Baxter's reputation is built on our ability to consistently provide quality products to the marketplace. To safeguard our customers' trust, every Baxter employee is expected to demonstrate uncompromising dedication to quality. Baxter employees are expected to:
>
> ✣ Deliver quality services conforming with the Global Quality System;
>
> ✣ Act as champions of product quality and quality systems;
>
> ✣ Meet commitments to regulatory authorities;
>
> ✣ Immediately raise quality issues to your manager and/or to the appropriate quality personnel;
>
> ✣ Report all product complaints to Product Surveillance within one business day;
>
> ✣ Report all adverse events from any source to Global Patient Safety within one business day; and
>
> ✣ Fully understand, be trained in, and follow your department's Standard Operating Procedures (SOPs).

80. In a section titled "Advertising and Promotion," the Code of Conduct states, in relevant part, that:

> ADVERTISING AND COMPETITORS
>
> Baxter employees must not unfairly criticize a competitor's products or services. In addition, comparisons between products on safety and efficacy must not be made without appropriate clinical data to support the claims being made. In some countries, all comments about a competitor or their products or services are prohibited, and special care must be taken in such cases to ensure legal compliance.
>
> PROMOTION
>
> All Baxter promotional material, including advertising, literature, and public statements about products and services, must be truthful and non-misleading and must include a balanced picture of risks and benefits. The materials must be supported by appropriate back up, such as clinical trials, and must not contain false or misleading information.

81. In a section titled "Business Intelligence," the Code of Conduct states, in relevant part, that:

> Information is critical in the global, fast-paced environment in which we conduct business. Baxter is committed to obtaining the business intelligence necessary for the operation and success of our business in a way that is both legal and ethical. Baxter employees and agents may not compromise our integrity in the pursuit of business intelligence by engaging in any of the following types of activity:
>
> ✜ Fraud or misrepresentation;
>
> ✜ Invasive techniques such as illegal entry or trespass;
>
> ✜ Use of gifts, bribes, or coercion to obtain confidential information;
>
> ✜ Solicitation or acceptance of information that is protected by trade-secret laws;
>
> ✜ The violation of legitimate non-disclosure agreements; or
>
> ✜ Utilizing third parties to engage in activities in which Baxter employees are prohibited from engaging.

82. In a section titled ""Inside Information" and Securities Trading," the Code of Conduct states, in relevant part, that:

> Baxter periodically discloses to the public important information concerning the company. These disclosures should be full, fair, accurate, timely, and understandable.
>
> Until Baxter has made important information about the company public, employees must keep it confidential and may not use it for their own personal gain. It is a violation of United States securities law to purchase or sell Baxter stock on the basis of material non-public information.
>
> In the course of their jobs, Baxter employees also may receive material non-public information about other companies. Employees must also hold this information confidential and may not trade in the stock of other companies on the basis of it. Additionally, employees may not engage in certain aggressive trading activities with respect to Baxter stock (including short-selling, hedging, purchasing Baxter stock on margin and pledging Baxter stock as collateral).
>
> Employees at the vice president level or above and employees who regularly have access to material non-public information have additional obligations, including restrictions on trading in derivatives, and in some cases quarterly closed "windows" or obligation to pre-clear trades with the legal team. These obligations – and more information about trading generally – are provided in the Baxter Securities Trading Policy.

83. In a section titled "Communications with the Media and Investors," the Code of Conduct states, in relevant part, that:

> Baxter's reputation with the community depends on having appropriate channels for discussion and providing accurate, timely and consistent information.
>
> Baxter authorizes only certain individuals to speak to the media and financial community.
>
> Unless you have been expressly authorized to speak on behalf of Baxter, you must direct all inquiries from the media to Corporate Communications and from the financial community to Corporate Investor Relations.

84. In a section titled "Baxter's Board of Directors, Public Policy Committee and Corporate Responsibility Office," the Code of Conduct states the following with regard to waivers:

> Any waiver of Baxter's Code of Conduct for executive officers or members of the Board of Directors must be approved by the full board. Any waiver must be promptly disclosed to shareholders as required by applicable law and stock exchange rules.

85. In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' schemes to cause the Company to engage in the Product Safety Misconduct and to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of the Exchange Act. Moreover, five of the Individual Defendants violated the Code of Conduct by engaging in insider trading. Additionally, in violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

**BAXTER'S AUDIT COMMITTEE CHARTER**

86. The Company's Audit Committee Charter states the following with regard to the purpose of the Audit Committee:

> The primary purpose of the Audit Committee (the "Committee") of the Board of Directors (the "Board") of Baxter International Inc. ("Baxter" or the "Company") is to assist the Board in fulfilling its oversight responsibilities of the Company's: (i) financial reporting process (including the integrity of its financial statements); (ii) system of internal control; (iii) internal and external audit process (including the qualifications, independence and performance of the independent auditor and performance of the internal auditor); and (iv) the process for monitoring compliance with laws and regulations. The Committee will also issue the report required to be included in the Company's annual proxy statement pursuant to the rules of the Securities and Exchange Commission ("SEC"). In performing its duties, the Committee will maintain effective working relationships with and open communication between the Board, management and the internal and independent auditors.

87. The Audit Committee Charter states the following with regard to the Audit Committee's "Key Responsibilities":

> The Committee's job is one of oversight and it recognizes that the Company's management is responsible for preparing the Company's financial statements and that the outside auditors are responsible for auditing those financial statements.

> Additionally, the Committee recognizes that financial management, the internal audit staff and the outside auditors, have more time, knowledge and more detailed information on the Company than do Committee members; consequently, in carrying out its oversight responsibilities (including with respect to the Company's risk management policies and procedures), the Committee is not providing any expert or special assurance as to the Company's financial statements or any professional certification as to the outside auditor's work. Additionally, the Committee shall have the authority to approve certain business development and finance activities of the Company without further action of the Board, subject to the limitations set forth below. The following functions shall be the common recurring or other permissible activities of the Committee in carrying out the functions described above. These functions are set forth as a guide with the understanding that the Committee may diverge from this guide as appropriate given the circumstances, and in accordance with applicable rules, regulations and listing standards and any restrictions imposed by the Board.

88. In a section titled "Internal Control," the Audit Committee Charter states the following responsibilities of the Audit Committee:

> • Review Baxter's significant policies and procedures with management, including its disclosure controls and procedures and its internal controls and procedures for financial reporting and cybersecurity, and recommend to the Board any changes considered appropriate.
>
> • Review the adequacy and effectiveness of Baxter's financial and accounting controls with the independent auditor and the internal auditor, as appropriate, receiving recommendations for the improvement of such controls and reviewing whether any such previously approved recommendations have been implemented.

89. In a section titled "Internal Audit," the Audit Committee Charter states the following responsibilities of the Audit Committee:

> • Review the qualifications and organizational structure of the internal audit function and concur in the appointment, replacement, reassignment or dismissal of the Vice President, corporate audit.
>
> • Review and approve the proposed annual audit plan of the internal auditor and any significant changes to such plan, including the independence and authority of the internal auditor, and review the adequacy of internal audit's budget and staffing and the coordination and completeness of coverage between the internal and independent auditors.
>
> • Receive periodic summaries of significant findings from completed internal audits and, as appropriate, the status of major audits in process. Receive progress reports on the completion of the current year's internal audit plan, including explanations

for any significant deviations from the plan.

90. In a section titled "Financial Reporting," the Audit Committee Charter states the following responsibilities of the Audit Committee:

> • Review and discuss the Company's consolidated financial statements (including Management's Discussion and Analysis of Financial Condition and Results of Operations and any off-balance sheet arrangements) that will be contained in its Annual Report to Shareholders with management and the independent auditor to determine whether they are complete and consistent with information known to the Committee members, and whether the independent auditor is satisfied with the disclosure and content of those financial statements. Based on such review, recommend to the Board that the consolidated financial statements of the Company be included in its Annual Report on Form 10-K (and the Annual Report to Shareholders if distributed prior to the filing of the Form 10-K with the SEC).
>
> • Review with management, the independent auditor and the internal auditor the interim consolidated financial statements of the Company (including Management's Discussion and Analysis of Financial Condition and Results of Operations and any off-balance sheet arrangements) and the results of the independent auditor's review of those statements. This review shall occur prior to the Company's filing of the Form 10-Q with the SEC and may, at the Committee's discretion, be performed by the Committee Chairperson.
>
> • Discuss with the independent auditor the auditor's judgments about the quality and the acceptability of accounting principles used to prepare the Company's consolidated financial statements (including all relevant critical accounting policies and practices to be used), and all alternative treatments within GAAP for policies and practices related to material items that have been discussed by the independent auditors and management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the auditors.
>
> • Review the impact on the annual financial statements of any significant accounting and reporting issues, including recent professional and regulatory pronouncements and any newly adopted or proposed changes in accounting principles that would significantly affect Baxter or its consolidated financial statements.
>
> • Review as appropriate any analyses prepared by management and/or the independent auditors setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements.
>
> • Review all other material written communications between the independent auditors and management, such as any management letter or schedule of unadjusted differences, as provided to the Committee by the independent auditor.

> • Discuss earnings press releases (particularly the use of any non-GAAP financial information), as well as financial information and earnings guidance provided to analysts and rating agencies, with the Committee prior to issuance of the release; provided that this review may, at the Committee's direction, be performed by the Committee Chairperson.

91. In a section titled "Ethical and Legal Compliance," the Audit Committee Charter states the following responsibilities of the Audit Committee:

> • Oversee legal and regulatory compliance as it relates to financial matters, including accounting, auditing, financial reporting and related securities law issues (recognizing that the Quality, Compliance & Technology Committee is charged more broadly with oversight of legal, regulatory and other compliance).
>
> • Periodically review with Company counsel legal and regulatory matters that may have a significant impact on Baxter or its financial statements.
>
> • In conjunction with the Quality, Compliance & Technology Committee, evaluate whether management is effectively communicating the importance of Baxter's ethical and business practices standards, including the importance of internal accounting controls.
>
> • Establish procedures for (i) the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and (ii) the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters.

92. In violation of the Audit Committee Charter, Defendants Morrison and Smith conducted little, if any, oversight of the Company's engagement in the Individual Defendants' schemes to cause the Company to engage in the Product Safety Misconduct and to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of the Exchange Act. Moreover, in violation of the Audit Committee Charter, Defendants Morrison and Smith failed to maintain the accuracy of Company records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

93. Baxter is an Illinois-based company which develops, produces, and sells a wide variety of healthcare products. The Company manufactures products in over 20 countries and sells its products in over 100 countries, as of December 31, 2024. The Company's customer base includes nursing homes, hospitals, rehabilitation and ambulatory surgery centers, doctors' offices, kidney dialysis centers, and patients at home under physician supervision.

94. The Company's operations consist of three reportable segments: Medical Products & Therapies, Healthcare Systems & Technologies, and Pharmaceuticals. The Medical Products & Therapies segment covers sales of the following products: sterile IV solutions, infusion systems, administration sets, parenteral nutrition therapies and surgical hemostat, sealant and adhesion prevention products.

95. The Healthcare Systems & Technologies segment covers sales of connected care solutions and collaboration tools such as patient monitoring systems and respiratory health devices. The Pharmaceuticals segment covers the sales of specialty injectable pharmaceuticals, inhaled anesthetics and drug compounding services.

96. Among the Company's more recent product launches is the Novum LVP, a device intended to control IV fluid delivery to patients. The Novum LVP functions as a computer-controlled device, and has been marketed by the Company as possessing error prevention technology with regard to IV dosages for patients.

### The Product Safety Misconduct

97. The Company initially sold the Novum LVP in Canada following marketing approval from Canadian officials in late 2020. Notably, the Novum LVP presented significant safety issues during its use in Canadian hospitals particularly with regard to under- and over-

medicating patients.

98. Specifically: (1) the Novum LVP featured significant design defects which resulted in product failures such as over infusion, under infusion, and non-delivery of fluids; (2) the design defects present in the Novum LVP exposed patients to serious injury or death; (3) the Company was notified of the defects in the Novum LVP, in addition to injuries and deaths linked to the product; and (4) the Company's use of customer alerts to address the defects in the Novum LVP was an inadequate remedy, as such defects continued to be present notwithstanding the alerts.

99. Nevertheless, in April 2024, the FDA gave Baxter clearance to sell the Novum LVP following assurances made by the Company that the issues with the Novum LVP observed in Canadian hospitals had been resolved.

***April 7, 2025 News Report***

100. The truth regarding the Product Safety Misconduct began to emerge on April 7, 2025, when a Missouri news outlet covered a story regarding the Novum LVP and a whistleblower at BJC Health Systems ("BJC"), a major hospital system based in St. Louis. The whistleblower stated that "patients should not be being treated with these pumps. These pumps are not safe." Moreover, the whistleblower alleged that BJC staff observed and reported significant malfunctions in the Novum LVP devices just days after the product's implementation. Regarding the Company's purportedly sufficient attempts to remedy the Novum LVP's defects, the whistleblower stated that "no, they have all been Band-Aid solutions." As a result of the April 7, 2025 news report, BJC removed its Novum LVP devices from service. Nevertheless, the Individual Defendants continued to obfuscate the true nature of the Novum LVP's design defects and the impact of such defects on the Company's financial prospects.

***April 24, 2025 Warning Letter***

101. The truth continued to emerge on April 24, 2025 when the Company issued a warning letter to customers (the "April 2025 Letter") regarding a potential risk of under infusion associated with the Novum LVP. However, the April 2025 Letter only disclosed one serious injury linked to the under infusion risk. In light of the disclosures made concerning the risk of under infusion associated with the Novum LVP, the April 2025 Letter instructed customers to "monitor patients frequently to ensure that the appropriate infusion is being delivered."

102. Nevertheless, the Individual Defendants continued to obfuscate the true nature of the Novum LVP's design defects and the impact of such defects on the Company's financial prospects. For instance, the April 2025 Letter stated that "customers can continue to use the Novum IQ LVP" and that the Company was "developing a software update" to resolve the product defect.

***June 6, 2025 FDA Recall***

103. The truth continued to emerge on June 6, 2025, when the FDA issued a recall (the "June 2025 Recall") regarding the contents of the April 2025 Letter. The FDA explained in the June 2025 Recall notice that, according to the Company, the Novum LVP could deliver less medication than intended if left in standby mode for more than 2 hours and 30 minutes or powered off with the infusion set still loaded.

104. The FDA noted that, under the worst-case conditions, the Novum LVP defect could cause an upwards of 50 percent under infusion. According to the FDA, such a level of under infusion may lead to serious injury or death, especially in vulnerable patients such as infants. Additionally, the June 2025 Recall notice stated that the Company was in the process of updating the Novum LVP's instructions to account for the under infusion risk and that it was directing customers to continue "monitor[ing] patients frequently to ensure that the appropriate infusion is being delivered." Nevertheless, the Individual Defendants continued to obfuscate the true nature

of the Novum LVP's design defects and the impact of such defects on the Company's financial prospects.

***July 14, 2025 Warning Letter***

105. The truth continued to emerge on July 14, 2025, when the Company issued a second warning letter (the "July 2025 Letter") which re-emphasized the risk of under infusion associated with the Novum LVP in addition to noting the risk of over infusion associated with the Novum LVP. The July 2025 Letter stated that under infusion could occur when flow rates increase from a low baseline to a high second rate (including when no fluid is delivered). The July 2025 Letter further states that over infusion, under infusion, and complete non-delivery could occur due to the misloading of the infusion set into the pump. Moreover, the July 2025 Letter noted that between June 2023 and May 2025, ***the Company received seventy-nine reports of serious injury and two deaths in relation to the defects noted above***. Nevertheless, the Company did not instruct customers to remove the Novum LVP from service but instead instructed customers to follow mitigation steps and stated that it would provide software updates to correct the product defects.

***July 22, 2025 FDA Recall***

106. On June 22, 2025, the FDA issued a second recall (the "July 2025 Recall"), based on the contents of the July 2025 Letter. The July 2025 Recall notice reiterated the risk of under infusion in the Novum LVP when transitioning from low flow rates to significantly higher rates as well as the risks of over infusion and complete non-delivery associated with the device. The July 2025 Recall notice also reported the injuries and deaths associated with the Novum LVP defects.

**False and Misleading Statements**

***February 23, 2022 Form 10-K***

107. The Relevant Period began on February 23, 2022 when the Company filed its

Annual Report on Form 10-K with the SEC reporting its financial results for the fiscal year ended December 31, 2021 (the "2021 10-K"). The 2021 10-K was signed by Defendants Almeida, Saccaro, Stevens, Morrison, Oesterle, Schlichting, Smith, Wendell, and Wilkes. Attached to the 2021 10-K were certifications made pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") and signed by Defendants Almeida and Saccaro certifying that the 2021 10-K "fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act]" and that the "information contained in the [2021 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

108. Regarding the Company's quality management, the 2021 10-K contained the following statements:

> **Quality Management**
>
> Our continued success depends upon the quality of our products. Quality management plays an essential role in determining and meeting customer requirements, ***helping to prevent defects***, facilitating continuing improvement of our processes, products and services, and ***helping to assure the safety and efficacy of our products***. Our quality system enables the design, development, manufacturing, packaging, sterilization, handling, distribution and labeling of our products to ensure that they conform to customer requirements. In order to consistently improve the effectiveness and efficiency of our quality system, various measurement, monitoring and analysis methods, such as management reviews and internal, external and vendor audits, are employed at local and central levels.
>
> Each product that we market is required to meet specific quality standards, both in packaging and in product integrity and quality. If any of those is determined to be compromised at any time, ***we endeavor to take corrective and preventive actions designed to ensure compliance with regulatory requirements and to meet customer expectations***.

109. Regarding the Company's regulatory obligations, the 2021 10-K stated the following:

> **Government Regulation**

> Our operations and many of the products manufactured or sold by us are subject to extensive regulation by numerous government agencies, both within and outside the United States.
>
> [… ]
>
> We, along with our facilities, are subject to periodic inspections and possible administrative and legal actions by FDA and other regulatory agencies inside and outside the United States. Such actions may include warning letters, product recalls or seizures, monetary sanctions, injunctions to halt the manufacture and distribution of products, civil or criminal sanctions, refusal of a government to grant approvals or licenses, restrictions on operations or withdrawal of existing approvals and licenses. As situations require, we take steps to ensure safety and efficacy of our products, such as removing products found not to meet applicable requirements from the market and improving the effectiveness of quality systems.

110. Regarding the Company's risk factors as they pertained to potential product quality issues, the 2021 10-K stated the following:

> Issues with product supply or quality ***could*** have an adverse effect on our business or cause a loss of customer confidence in us or our products, among other negative consequences.
>
> […]
>
> ***Our success also depends on our ability to maintain and routinely improve product quality and our quality management program***. Quality management plays an essential role in meeting customer requirements, preventing defects, improving our products and services and assuring the safety and efficacy of our products. ***While we have a quality system that covers the lifecycle of our products, quality and safety issues have and may in the future occur with respect to our products***. New or unintended uses of our product (for example, in response to COVID-19 or changing clinical practice) may also raise quality or safety issues. A quality or safety issue ***may*** result in adverse inspection reports, voluntary or official action indicated, warning letters, import bans, product recalls (either voluntary or required by FDA or similar governmental authorities in other countries) or seizures, monetary sanctions, injunctions to halt manufacture and distribution of products, civil or criminal sanctions, costly litigation, refusal of a government to grant approvals and licenses, restrictions on operations or withdrawal of existing approvals and licenses.
>
> […]
>
> An inability to address a quality or safety issue in an effective and timely manner ***may*** also cause negative publicity, a loss of customer confidence in us or our current

> or future products, which ***may*** result in the loss of sales and difficulty in successfully launching new products.

***February 23, 2022 Citi Research Healthcare Conference***

111. Also on February 23, 2022, Defendants Saccaro and Trachtman represented the Company at the Citi Research Healthcare Conference (the "Citi Conference"). During the Citi Conference, Defendant Saccaro stated that "[T]he reason the pump is exciting is it really leverages all of the best things that we have with our pump, including the Master Drug Library, ***the medication safety provisions that we have with respect to it***, simple and easy user interface."

112. Also during the Citi Conference, an analyst from Citigroup and Defendant Saccaro engaged in the following exchange:

> Joanne Wuensch, Citigroup: When we think about product launches and we've already been talking about one. What others are you most excited about for 2022?
>
> Defendant Saccaro: Sure, I'll answer and then can turn it over to Clare as well. On the Baxter side, ***I think Novum is a landmark. When that launches, it will be a landmark achievement for the company. And I think it's a -- it really sets the stage for continuing this idea and continuing leadership in connected care and solving problems for hospitals in new and different ways***. So we're so thrilled that, that one is in the works.

***March 7, 2022 Raymond James Institutional Investors Conference***

113. On March 7, 2022, Defendants Saccaro and Trachtman represented the Company at the Raymond James Institutional Investors Conference (the "Raymond James Conference"). During the Raymond James Conference, an analyst asked Defendant Saccaro about the Novum LVP launch. Defendant Saccaro stated the following in response:

> First of all, it's the first time that Baxter will have three pumps on the same platform. Second, ***the Novum pump incorporates all of our learnings from being in the large volume pump business for perhaps the last 20 years into this next generation pump. Things like a drug safety library***, things like simple and easy to use interface, all of these things have been incorporated into the new pump and we will be thrilled to bring this to market. And then following that, follow it on with a couple of incremental pumps.

> So very exciting for us, and I think it's a – we've been doing quite well with the Spectrum pump that we have on the market today. It's a testament to the quality of that pump as well but ***I do believe that launching Novum gives us the next leg to drive growth for years to come***.

***March 17, 2022 Barclays Global Healthcare Conference***

114. On March 17, 2022, Defendants Saccaro and Trachtman represented the Company at the Barclays Global Healthcare Conference (the "Barclays Conference"). During the Barclays Conference, Defendant Saccaro stated that "I think that ***the Novum pump will be an important long-term value driver for the company***."

***April 28, 2022 Form 10-Q***

115. On April 28, 2022, the Company filed its quarterly report on Form 10-Q reporting the Company's financial results for the first quarter of 2022 (the "Q1 2022 10-Q"). The Q1 2022 10-Q was signed by Defendant Saccaro and included SOX certifications signed by Defendants Almeida and Saccaro certifying that the Q1 2022 10-Q "fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act]" and that the "information contained in the [Q1 2022 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company." The Company stated in the Q1 2022 10-Q that "We do not believe there have been any material changes to the risk factors previously disclosed in our [2021 10-K]." The risk factors included in the 2021 10-K have been referenced and identified in ¶110, *supra*.

***April 28, 2022 Earnings Call***

116. Also on April 28, 2022, the Company hosted an earnings call with investors and analysts to discuss its financial results for the first quarter of 2022 (the "Q1 2022 Earnings Call"). During the prepared remarks portion of the Q1 2022 Earnings Call, Defendant Almeida stated the following:

> As you saw in this morning's release, we shared a status update on our Novum IQ large volume infusion pump with Dose IQ Safety Software, which has been under

> review by FDA. We received the letter from the agency last Friday with a request for additional information. As a result, the 510(k) review window has been placed on hold so that our team can address accordingly.
>
> The team currently plans to respond to FDA within the calendar year. We remain on track to submit responses on the Novum IQ Syringe Pump filing to FDA in the second quarter of 2022. I want to emphasize that while we can't speak for FDA or the eventual outcome of their review process, ***we are confident in our leading-edge Novum IQ technology. We are committed to responding to FDA's request and to bringing the benefits of Novum IQ to patients and clinicians in the US and beyond***.

117. During the question-and-answer portion of the Q1 2022 Earnings Call, an analyst engaged in the following exchange with Defendant Almeida:

> Danielle Antalffy, SVB Leerink: Just one question on the Novum platform. I'm just curious, Joe, this delay here, if that changes your view of the potential longer term or even in the mid-term, once the platform does launch and the market share gains that Baxter should be able to get? And then I have one follow-up.
>
> Defendant Almeida: Danielle, good morning. We have received the letter. We understand what needs to be addressed, and we plan to address towards the end of the year, like we just said in our prepared remarks. Addressing the request does not change the faith I have in the product line. ***We have this product currently working in Canada and is, from my perspective, a great product***. We have tremendous respect for what the agency says and I don't speak on behalf of the FDA. So we're working very closely to make sure that we can address the outstanding main issue as soon as we can [unintelligible] end of the year.
>
> ***I have faith in the platform***. We designed that from scratch. It was the first electromechanical product designed by Baxter from scratch. We put the resources in place and we're still very optimistic about what it can do in the marketplace. So it's a great technology and – but this is my opinion, and I hope that we can get this clear towards the end of the year.

***May 25, 2022 Investor Conference***

118. On May 25, 2022, the Company hosted an investor conference during which Defendant Knight underlined the Company's confidence in the Novum LVP and cited positive feedback from Canadian customers, stating:

> And as you know, we're looking forward to the launch of NOVUM IQ in the US upon receiving FDA approval. Now, we can't speak on behalf of the FDA, but ***I remain very, very confident in this platform, because of the feedback we've gotten***

> ***from our customers, because of the feedback our customers have given us in the design of this platform, and because our customers in Canada are already enjoying this platform today, and we're getting great feedback***. So I'm very, very excited, and while it's been a long road, ***I'm optimistic as ever about the launch of Novum IQ***.

***July 28, 2022 Form 10-Q***

119. On July 28, 2022, the Company filed its quarterly report on Form 10-Q reporting its financial results for the second quarter of 2022 (the "Q2 2022 10-Q"). The Q2 2022 10-Q was signed by Defendant Saccaro and included SOX certifications signed by Defendants Almeida and Saccaro certifying that the Q2 2022 10-Q "fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act]" and that the "information contained in the [Q2 2022 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company." The Company stated in the Q2 2022 10-Q that "we do not believe there have been any material changes to the risk factors previously disclosed in our 2021 Annual Report[.]" The risk factors included in the 2021 10-K have been referenced and identified in ¶110, *supra*.

***October 27, 2022 Earnings Call and Form 10-Q***

120. On October 27, 2022, Baxter hosted an earnings call with investors and analysts to discuss its financial results for the third quarter of 2022 (the "Q3 2022 Earnings Call"). During the Q3 2022 Earnings Call, Defendant Almeida stated that he "believe[d] that [Baxter] ha[d] successfully resolved the issue that was the primary subject of the FDA's last additional information request." Defendant Almeida further stated that Baxter was "very comprehensive in how we answer the FDA. We work very collaboratively with them, and we want to make sure that the product has all the information before we send to them."

121. That same day, the Company filed its quarterly report on Form 10-Q with the SEC, reporting its financial results for the third quarter of 2022 (the "Q3 2022 10-Q"). The Q3 2022 10-Q was signed by Defendant Saccaro and included SOX certifications signed by Defendants

Almeida and Saccaro certifying that the Q3 2022 10-Q "fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act]" and that the "information contained in the [Q3 2022 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company." The Company stated in the Q3 2022 10-Q that "we do not believe there have been any material changes to the risk factors previously disclosed in our [2021 10-K]." The risk factors included in the 2021 10-K have been referenced and identified in ¶110, *supra*.

***February 9, 2023 Earnings Call***

122. On February 9, 2023, the Company hosted an earnings call with investors and analysts to discuss its financial results for the fourth quarter of 2022 (the "Q4 2022 Earnings Call"). During the Q4 2022 Earnings Call, Defendant Almeida boasted of the purported success of the Novum LVP in Canada, stating "[w]e feel optimistic where we are with the pump today. We don't speak on behalf of the FDA. Neither [sic] we're making a prediction about that, ***but we're saying that we're enthusiastic because we know the products are doing very well in Canada***."

***February 9, 2023 Form 10-K***

123. Also on February 9, 2023, the Company filed its Annual Report on Form 10-K with the SEC reporting its financial results for the fiscal year ended December 31, 2022 (the "2022 10-K"). The 2022 10-K was signed by Defendants Almeida, Saccaro, Stevens, Morrison, Oesterle, Schlichting, Shafer, Smith, Wendell, Wilkes, and Wilver. The 2022 10-K included SOX certifications signed by Defendants Almeida and Saccaro certifying that the 2022 10-K "fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act]" and that the "information contained in the 2022 10-K fairly presents, in all material respects, the financial condition and results of operations of the Company." The 2022 10-K contained substantively the same risk factors referenced and identified in ¶110, *supra*.

124. The statements in ¶¶107-123 above were materially false and misleading and failed to disclose, *inter alia*, that: (1) Baxter was engaging in the Product Safety Misconduct; (2) in light of the Company's inadequate remedial measures to address the Product Safety Misconduct, there was an increased likelihood that customers would stop using the Novum LVPs on patients; (3) as a result, the Company would halt the sale of the Novum LVP; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

***2023 Proxy Statement***

125. On March 23, 2023, the Company filed its Schedule 14A with the SEC (the "2023 Proxy Statement"). The 2023 Proxy Statement was solicited by Defendants Almeida, Morrison, Oesterle, Schlichting, Shafer, Smith, Wendell, Wilkes, and Wilver, pursuant to Section 14(a) of the Exchange Act, and contained materially false and misleading statements.

126. The 2023 Proxy Statement solicited shareholders to vote to, *inter alia*: (1) re-elect Defendants Almeida, Morrison, Oesterle, Schlichting, Shafer, Smith, Wendell, Wilkes, Wilver and non-party Michael F. Mahoney ("Mahoney") to serve as directors until the next annual meeting of stockholders; (2) approve, on an advisory basis, named executive officer compensation for 2022; (3) approve, on an advisory basis, the frequency of executive compensation advisory votes; (4) ratify the appointment of PricewaterhouseCoopers LLP as the independent registered public accounting firm for Baxter in 2023; (5) approve the stockholder proposal relating to stockholder ratification of termination pay, if properly presented at the Annual Meeting of Baxter Stockholders; and (6) approve the stockholder proposal relating to executives' retaining significant stock, if properly presented at the Annual Meeting of Baxter Stockholders.

127. With respect to the Code of Conduct, the 2023 Proxy Statement stated:

> Baxter has adopted a Code of Conduct that applies to all members of the Board and all employees of the company, including the CEO, Chief Financial Officer, Controller and other senior financial officers. Any amendment to, or waiver from, a provision of the Code of Conduct that applies to the CEO, Chief Financial Officer, Controller or persons performing similar functions will be disclosed on Baxter's website, at www.baxter.com under "Our Story—Our Governance—Corporate Governance Matters." The Code of Conduct is available on Baxter's website at www.baxter.com under "Our Story—Our Governance—Corporate Governance Matters—Code of Conduct." The QCT Committee is responsible for overseeing compliance with the Code of Conduct and regular training on the Code of Conduct is provided to the Board.

128. In a section titled "Board's Role in Risk Oversight," the 2023 Proxy Statement stated, in relevant part:

> Baxter's risk management activities include the identification and assessment of the key risks facing the company among the universe of business risks (including strategic, operational, financial, regulatory/compliance and cybersecurity). These risks are identified across the organization and originate from multiple businesses, regions and functions. While management has day-to-day responsibility for assessing and managing the company's risk exposure, the Board and its committees provide active oversight in connection with those efforts (including in connection with the company's enterprise risk management (ERM) program, as described below). The Board and, as appropriate, its committees review each of the top risks identified and assessed by management on at least an annual basis and regularly receive updates on management's related mitigation strategies and practices.

129. Under the direction and watch of Defendants Almeida, Morrison, Oesterle, Schlichting, Shafer, Smith, Wendell, Wilkes, and Wilver, the 2023 Proxy Statement was materially false and misleading and failed to disclose, *inter alia*, that: (1) Baxter was engaging in the Product Safety Misconduct; (2) in light of the Company's inadequate remedial measures to address the Product Safety Misconduct, there was an increased likelihood that customers would stop using the Novum LVPs on patients; (3) as a result, the Company would halt the sale of the Novum LVP; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

130. The 2023 Proxy Statement also failed to disclose, *inter alia*, that: (1) although the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2023 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

131. As a result of the material misstatements and omissions contained in the 2023 Proxy Statement, Company shareholders voted, *inter alia*, to: (1) re-elect Defendants Almeida, Morrison, Oesterle, Schlichting, Shafer, Smith, Wendell, Wilkes, Wilver and non-party Mahoney to serve as directors until the next annual meeting of stockholders; (2) approve, on an advisory basis, named executive officer compensation for 2022; (3) approve, on an advisory basis, the frequency of executive compensation advisory votes; and (4) ratify the appointment of PricewaterhouseCoopers LLP as the independent registered public accounting firm for Baxter in 2023.

***April 27, 2023 Form 10-Q***

132. On April 27, 2023, the Company filed its quarterly report on Form 10-Q with the SEC reporting its financial results for the first quarter of 2023 (the "Q1 2023 10-Q"). The Q1 2023 10-Q was signed by Defendant Saccaro and included SOX certifications signed by Defendants Almeida and Saccaro certifying that the Q1 2023 10-Q "fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act]" and that the "information contained in the [Q1 2023 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company." The Company stated in the Q1 2023 10-Q that "we do not believe there have been any material changes to the risk factors previously disclosed in our [2022 10-K]." The 2022 10-K contained substantively the same risk factors referenced and identified in ¶110, *supra*.

***July 27, 2023 Earnings Call and Form 10-Q***

133. On July 27, 2023, the Company hosted an earnings call with investors and analysts to discuss its financial results for the second quarter of 2023 (the "Q2 2023 Earnings Call"). During the Q2 2023 Earnings Call, Defendant Almeida conveyed to investors that the Company had resolved the FDA's concerns pertaining to the Novum LVP and was integrating updates from the Novum LVP launch in Canada, stating:

> [W]e believe we have successfully resolved the open issue that was primarily subject of the FDA's last additional information that they requested. ***Additionally, we have proactively implemented software changes that we had planned in consultation with the FDA. We have regular communications with the FDA during the review. We are committed to resolving any questions or issues that come up during the process and through learnings in connection with the recent launch of Novo LVP in Canada and related regulatory issues***. So we are working on software upgrades to our current version of the Canadian pump. As we work through this in the next few months, we work alongside the FDA to tell them what's going on. And we are cautiously optimistic. **We have a very good pump platform** and we want to get this thing done and through with the FDA. But we want to make sure that the best and most recent updates to the product are implemented before - in Canada and so we can communicate with the FDA properly. ***We are in constant communications with them***.

134. That same day, the Company filed its quarterly report on Form 10-Q with the SEC reporting its financial results for the second quarter of 2023 (the "Q2 2023 10-Q"). The Q2 2023 10-Q was signed by Defendant Stevens and included SOX certifications signed by Defendants Almeida and Stevens certifying that the Q2 2023 10-Q "fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act]" and that the "information contained in the [Q2 2023 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company." The Company stated in the Q2 2023 10-Q that "we do not believe there have been any material changes to the risk factors previously disclosed in our [2022 10-K]." The 2022 10-K contained substantively the same risk factors referenced and identified in ¶110, *supra*.

***September 7, 2023 Wells Fargo Securities Healthcare Conference***

135. On September 7, 2023, Defendant Almeida represented the Company at the Wells Fargo Conference. During the conference, Defendant Almeida boasted of the efficacy of the Novum LVP and noted additional improvements the Company was making in preparation for the product's launch in the U.S., stating:

> ***The intent is we because we have products launched in Canada, found a couple of changes that we need to make to software and hardware to the pump that we're currently undertaking the software we're finished, although we're doing a final review of software wise to make sure there's nothing else and hardware, there's a change -- two changes that we had to make. One was made already*.**
>
> […]
>
> ***We have remained optimistic on the pump. It's a great pump, works today. It's working on the market today*.**
>
> […]
>
> ***We put more resources than you can imagine to make sure that this product is absolutely what it needs to go into the US market. It is a product that has good precision, better than some products on market today in the US and has also a very good interface with the rest of hospital systems*.**

***November 2, 2023 Earnings Call and Form 10-Q***

136. On November 2, 2023, the Company hosted an earnings call with investors and analysts to discuss its financial results for the third quarter of 2023 (the "Q3 2023 Earnings Call"). During the Q3 2023 Earnings Call, Defendant Almeida represented to investors that Baxter was "in continued and regular conversations with [the FDA] during their review period."

137. Also on November 2, 2023, the Company filed its quarterly report on Form 10-Q with the SEC reporting its financial results for the third quarter of 2023 (the "Q3 2023 Form 10-Q"). The Q3 2023 10-Q was signed by Defendant Grade and included SOX certifications signed by Defendants Almeida and Grade certifying that the Q3 2023 10-Q "fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act]" and that the "information contained in the [Q3 2023 10-Q] fairly presents, in all material respects, the financial condition and results

of operations of the Company." The Company stated in the Q3 2023 10-Q that "we do not believe there have been any material changes to the risk factors previously disclosed in our [2022 10-K]." The 2022 10-K contained substantively the same risk factors referenced and identified in ¶110, *supra*.

***February 8, 2024 Form 10-K***

138. On February 8, 2024, the Company filed its Current Report on Form 10-K with the SEC reporting its financial results for the year ended December 31, 2023 (the "2023 10-K"). The 2023 10-K was signed by Defendants Almeida, Shafer, Grade, Stevens, Ampofo, Morrison, Oesterle, Rusckowski, Schlichting, Smith, Wendell, Wilkes, and Wilver. The 2023 10-K included SOX certifications signed by Defendants Almeida and Grade certifying that the 2023 10-K "fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act]" and that the "information contained in the [2023 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company." The 2023 10-K contained substantively the same risk factors referenced and identified in ¶110, *supra*.

***February 29, 2024 Citi Unplugged Medtech and Life Sciences Access Day Conference***

139. On February 29, 2024, Defendant Trachtman represented the Company at the Citi Unplugged Medtech and Life Sciences Access Day Conference (the "Citi Unplugged Conference"). At the Citi Unplugged Conference, Defendant Trachtman conveyed to investors that the U.S. launch of the Novum LVP would incorporate improvements to the product developed in the wake of the Canadian launch. More specifically, Defendant Trachtman stated the following:

> We did launch Novum in Canada. And so as things emerged as part of that launch, what we did was we brought those to the attention of FDA and ***we were able to address all of those issues that came up and that was part of the submission to FDA. So now, from our standpoint, we've addressed everything*** and we're cautiously optimistic that we'll hear something in 2024.

***February and March 2024 Marketing Materials***

140. As early as February 2024, the Company promulgated marketing materials on its corporate website regarding the Novum LVP, its technological features, and the overall safety of the device. For instance, the Novum LVP Sell Sheet (dated February 2024), represented that the products had “advanced technology to enhance safety and ease of use,” as well as “Titration Error Prevention technology, which allows Novum IQ pumps to intercept dose and rate changes that could be potentially harmful.”

141. Additionally, the Novum LVP Brochure (dated March 2024), advanced similar claims, such as that “a robust portfolio of administration sets is designed to deliver consistent accuracy with the Novum IQ Large Volume Pump.” The marketing materials referenced and identified here and in ¶140, *supra*, remained publicly available on the Company’s website as of November 13, 2025.

142. The statements in ¶¶132-141 above were materially false and misleading and failed to disclose, *inter alia*, that: (1) Baxter was engaging in the Product Safety Misconduct; (2) in light of the Company’s inadequate remedial measures to address the Product Safety Misconduct, there was an increased likelihood that customers would stop using the Novum LVPs on patients; (3) as a result, the Company would halt the sale of the Novum LVP; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Individual Defendants caused the Company’s public statements to be materially false and misleading at all relevant times.

***2024 Proxy Statement***

143. On March 25, 2024, the Company filed the 2024 Proxy Statement with the SEC. The 2024 Proxy Statement was solicited by Defendants Almeida, Ampofo, Morrison, Oesterle, Rusckowski, Schlichting, Shafer, Smith, Wendell, Wilkes, and Wilver, pursuant to Section 14(a) of the Exchange Act, and contained materially false and misleading statements.

144. The 2024 Proxy Statement solicited shareholders to vote to, *inter alia*: (1) re-elect Defendants Almeida, Ampofo, Morrison, Oesterle, Rusckowski, Schlichting, Shafer, Smith, Wendell, Wilkes, and Wilver to serve as directors until the next annual meeting of stockholders; (2) approve, on an advisory basis, named executive officer compensation for 2023; (3) ratify the appointment of PricewaterhouseCoopers LLP as the independent registered public accounting firm for Baxter in 2024; (4) approve the Company's Amended and Restated 2021 Incentive Plan (the "2021 Plan"); (5) approve an amendment to the Amended and Restated Certificate of Incorporation to permit officer exculpation; and (6) approve the stockholder proposal relating to executives' retaining significant stock, if properly presented at the Annual Meeting of Baxter Stockholders.

145. The 2024 Proxy Statement stated that the "purpose of the [Amended 2021 Plan] is to increase stockholder value and provide a means to advance the interests of the Company . . . by providing a variety of economic incentives designed to motivate, retain and attract employees, directors, consultants, advisors and other persons providing services to the Company." Such economic incentives are referred to as "awards," and include, *inter alia*, "any Incentive Stock Option, Nonqualified Stock Option, Stock Appreciation Right, Restricted Stock, Restricted Stock Unit, deferred stock, deferred stock units, performance shares, performance share units, Performance Compensation Award, Other Stock-Based Award, Other Cash-Based Award." According to the 2024 Proxy Statement, the Amended 2021 Plan increased "the aggregate number of shares of common stock authorized for issuance by 40,000,000." As of December 31, 2024, roughly 48.1 million shares of common stock remained available for issuance under the Amended 2021 Plan.

146. With respect to the Code of Conduct, the 2024 Proxy Statement stated:

> Baxter has adopted a Code of Conduct that applies to all members of the Board and all employees of the company, including the CEO, Chief Financial Officer (CFO),

> Controller and other senior financial officers. Any amendment to, or waiver from, a provision of the Code of Conduct that applies to the CEO, CFO, Controller or persons performing similar functions will be disclosed on Baxter's website, at www.baxter.com under "Our Story—Our Governance—Corporate Governance Matters." The Code of Conduct is available on Baxter's website at www.baxter.com under "Our Story—Our Governance—Corporate Governance Matters—Code of Conduct." The full Board is responsible for overseeing compliance with the Code of Conduct and regular training on the Code of Conduct is provided to the Board and made available to employees, including senior management.

147. In a section titled "Board's Role in Risk Oversight," the 2024 Proxy Statement stated, in relevant part:

> Baxter's risk management activities include the identification and assessment of the key risks facing the company including strategic, operational, financial, regulatory and compliance and cybersecurity risks, among others. These risks are identified across the organization and originate from multiple businesses, regions and functions. While management has day-to-day responsibility for assessing and managing the company's risk exposure, the Board and its committees provide active oversight in connection with those efforts (including in connection with the company's enterprise risk management (ERM) program, as described below). The Board and, as appropriate, its committees review each of the top risks identified and assessed by management on at least an annual basis and regularly receive updates on management's related mitigation strategies and activities.

148. Under the direction and watch of Defendants Almeida, Ampofo, Morrison, Oesterle, Rusckowski, Schlichting, Shafer, Smith, Wendell, Wilkes, and Wilver, the 2024 Proxy Statement was materially false and misleading and failed to disclose, *inter alia*, that: (1) Baxter was engaging in the Product Safety Misconduct; (2) in light of the Company's inadequate remedial measures to address the Product Safety Misconduct, there was an increased likelihood that customers would stop using the Novum LVPs on patients; (3) as a result, the Company would halt the sale of the Novum LVP; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

149. The 2024 Proxy Statement also failed to disclose, *inter alia*, that: (1) although the Company claimed its officers and directors adhered to the Code of Conduct, the Individual

Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2024 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

150. As a result of the material misstatements and omissions contained in the 2024 Proxy Statement, Company shareholders voted to: (1) re-elect Defendants Almeida, Ampofo, Morrison, Oesterle, Rusckowski, Schlichting, Shafer, Smith, Wendell, Wilkes, and Wilver to serve as directors until the next annual meeting of stockholders; (2) approve, on an advisory basis, named executive officer compensation for 2023; (3) ratify the appointment of PricewaterhouseCoopers LLP as the independent registered public accounting firm for Baxter in 2024; (4) approve the Company's Amended and Restated 2021 Incentive Plan; and (5) approve an amendment to the Amended and Restated Certificate of Incorporation to permit officer exculpation.

***April 1, 2024 Press Release***

151. On April 1, 2024, the Company issued a press release to announce that the Novum LVP had received clearance from the FDA (the "April 2024 Press Release"). In the April 2024 Press Release, Defendant Knight stated the following:

> ***Our goal, always, is to bring increased efficiency, safety and opportunity for informed decision-making to our customers, clinicians and the patients they serve***. The Novum IQ platform represents a meaningful shift in how connected and intelligent infusion therapy can impact the way clinicians provide care. Offering Novum IQ large volume and syringe infusion pumps unlocks the potential of advanced, intuitive technologies that customers seek to meet their needs.

***May 2, 2024 Earnings Call and Form 10-Q***

152. On May 2, 2024, the Company hosted an earnings call to discuss with investors and analysts the Company's financial results for the first quarter of 2024 (the "Q1 2024 Earnings Call"). During the Q1 2024 Earnings Call, Defendant Almeida stated that "[w]e believe we're well

positioned to build on our momentum in [Medical Products & Therapies] with the recent U.S. FDA clearance of our leading-edge Novum IQ large volume infusion pump and Dose IQ Safety Software."

153. Also on May 2, 2024, the Company filed its quarterly report on Form 10-Q with the SEC reporting its financial results for the first quarter of 2024 (the "Q1 2024 10-Q"). The Q1 2024 10-Q was signed by Defendant Grade and included SOX certifications signed by Defendants Almeida and Grade certifying that the Q1 2024 10-Q "fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act]" and that the "information contained in the [Q1 2024 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company." The Company stated in the Q1 2024 10-Q that "we do not believe there have been any material changes to the risk factors previously disclosed in our [2023 10-K]." The 2023 10-K contained substantively the same risk factors referenced and identified in ¶110, *supra*.

***May 7, 2024 Annual Shareholder Meeting***

154. On May 7, 2024, the Company hosted its annual shareholder meeting (the "2024 Shareholder Meeting"). During the 2024 Shareholder Meeting, Defendant Almeida discussed with investors the purported strength of the Novum LVP launch, stating the following, in relevant part:

> Another factor that is very important for Baxter is the growth through innovation . . . . ***As an example, the approval of our Novum pump about three or four weeks ago is an indication how a best-in-class pump will be deployed into hospitals with the integration into EMRs, creating an environment, where clinicians can access a world-class drug library and able to bring together a safer delivery of medication to the patient***.

***May 15, 2024 Bank of America Healthcare Conference***

155. On May 15, 2024, Defendant Trachtman represented the Company at the Bank of America Healthcare Conference (the "BofA Conference"). At the BofA Conference, Defendant Trachtman conveyed Baxter's satisfaction with the Novum LVP, stating the following:

> ***Again I would say we are – we're extremely pleased with Novum. It has some great features. It has some of the most advanced features out there***. It does offer both the syringe and LVP with it. So, we're excited about the opportunity to introduce this to customers. I think that we've had outreach already from a number of existing customers and some competitive customers. So, the teams are out there discussing the benefits that it will offer. So, we're very optimistic about what this means. We've kind of said that this is not only an opportunity for us to continue to maintain our installed base, but look at that competitive set as well.

***June 5, 2024 Jefferies 2024 Global Healthcare Conference***

156. On June 5, 2024, Defendant Trachtman represented the Company at the Jefferies 2024 Global Healthcare Conference. At the Jefferies 2024 Global Healthcare Conference, Defendant Trachtman touted the Novum LVP's purported safety and efficacy as compared to the Company's prior products, stating that "***[i]t has some of the most advanced safety features that are available***" and that Baxter "***expect[s] to do even better with Novum***."

***August 6, 2024 Earnings Call***

157. On August 6, 2024, the Company hosted an earnings call to discuss with investors and analysts its financial results for the second quarter of 2024 (the "Q2 2024 Earnings Call"). During the Q2 2024 Earnings Call, an analyst asked a question pertaining to the Novum LVP rollout in the United States. Defendant Almeida responded by stating the following:

> We found -- as a matter of fact, we have sales of Novum in the second quarter, which we did not expect to have, but ***we're a little faster in having the product ready for the market. What we've seen is great interest. It plays well for our ability to compete***.
>
> As you know, Spectrum is a great product, but it does not have a syringe pump, and having a syringe pump makes a huge difference. ***So we're very happy with the momentum that we're getting in Novum***. We've been showing that to very large hospital systems and small as well. Our team is very hard at work. And ***we feel confident in the technology***. So, we have the ability to take market share. I think that is an important thing. ***This is about providing our patients and our customers with the best technology on the market***, not a reengineered technology from many, many years ago.

158. Also on August 6, 2024, the Company filed its quarterly report on Form 10-Q with the SEC reporting its financial results for the second quarter of 2024 (the "Q2 2024 10-Q"). The Q2 2024 10-Q was signed by Defendant Grade and included SOX certifications signed by Defendants Almeida and Grade certifying that the Q2 2024 10-Q "fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act]" and that the "information contained in the [Q2 2024 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company." The Company stated in the Q2 2024 10-Q that "we do not believe there have been any material changes to the risk factors previously disclosed in our [2023 10-K]." The 2023 10-K contained substantively the same risk factors referenced and identified in ¶110, *supra*.

***September 5, 2024 Wells Fargo Investor Call***

159. On September 5, 2024, the Company participated in the Wells Fargo investor call (the "Wells Fargo Call"). During the Wells Fargo Call, Defendant Grade stated the following with regard to the performance of the Novum LVP launch and the use of the Canadian launch to troubleshoot issues with the product prior to its rollout in the U.S.:

> ***The launch itself has gone well***.
>
> […]
>
> ***I mean I actually think we're off to a really good start in that***. I think the demand has been at levels probably even above what we expected. We've had kind of a mix of wins between our existing customers as well as some competitive wins. We originally talked about the impact of that starting in the third quarter.
>
> […]
>
> ***I'd say the other thing, too, that I think is kind of something we haven't talked about that much, but I think it is an important part of this, is that product was actually launched in Canada for a couple of years.***

> ***So we actually have the ability to -- if there's some bugs or some tweaks that we had to do within that product, we got a lot of that taken care of by the time we actually launched it in the US. And so I think the reception of that has been really strong and again the launch itself has gone well and the demand for the product has been outstanding***.

160. Also during the Wells Fargo Call, Defendant Trachtman touted to investors the Novum LVP's purportedly advanced safety features as well as the Company's confidence in its financial prospects, stating the following:

> I mean, I think that the features of Novum, it has over-the-air firmware updates that we can obviously apply those remotely. So it allows for many of the pumps to be remote serviceability. So 95% of our pumps will be able to be serviced that way. It's also, we have the standard platform between the LVP and syringe, which we didn't offer. ***We have the most advanced safety features in the largest drug library out there, which, again any changes to the drug library can be applied wirelessly as well. That those are a lot of the features that resonate. Again, we also talk about, we look at it just overall just the value and quality proposition that we provide to the hospitals as well across the portfolio***.
>
> I think ***the launch of Novum gives us confidence in achieving above market growth for the next couple of years***.

***November 8, 2024 Earnings Call***

161. On November 8, 2024, the Company hosted an earnings call to discuss with investors and analysts its financial results for the third quarter of 2024 (the "Q3 2024 Earnings Call"). During the Q3 2024 Earnings Call, Defendant Almeida represented to investors that the Novum LVP launch was proceeding seamlessly, stating the following:

> ***I think your question about the Novum update is that is going extremely well***. The market share growth, we usually in the past, used to gain about 1% market share every year just by rule of thumb. We are seeing 2% to 2.5% by the end of this year. And we're going to continue to accelerate that. The acceptance of the pump has been significant. ***And we're very happy how the team has launched the product. It's one of the best launches that I've seen in my career***.

***November 12, 2024 Form 10-Q***

162. On November 12, 2024, the Company filed its quarterly report on Form 10-Q with the SEC reporting its financial results for the third quarter of 2024 (the "Q3 2024 10-Q"). The Q3

2024 10-Q was signed by Defendant Grade and included SOX certifications signed by Defendants Almeida and Grade certifying that the Q3 2024 10-Q "fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act]" and that the "information contained in the [Q3 2024 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company." The Company stated in the Q3 2024 10-Q that "we do not believe there have been any material changes to the risk factors previously disclosed in our [2023 10-K]." The 2023 10-K contained substantively the same risk factors referenced and identified in ¶110, *supra*.

***November 18, 2024 Stifel Healthcare Conference***

163. On November 18, 2024, Defendant Grade represented the Company at the Stifel Healthcare Conference. At the Stifel Healthcare Conference, Defendant Grade discussed the importance of the Novum LVP to the Company's Medical Products and Therapies business as well as its overall growth, stating the following:

> So if I look across our businesses, ***starting with MPT, clearly, our Novum pump has become one of the key focus areas of that business, and one of our key growth drivers***.
>
> This year, our pump growth has been close to 50%, both from a Novum perspective, obviously, as well as our Spectrum pumps. ***And the pumps themselves, been both, from – goes - the LVP pump, the syringe pump. Again, in all cases, we're having some very strong growth. So, that's a strong innovation in that business***.

***November 20, 2024 Jefferies London Healthcare Conference***

164. On November 20, 2024, Defendant Grade represented the Company at the Jefferies London Healthcare Conference. At the Jefferies London Healthcare Conference, Defendant Grade continued to represent to investors that the Novum LVP launch was on track due to the Company's identification of product issues during the Canadian rollout. In relevant part, Defendant Grade stated the following:

> I mean, I think our pump business in general has been strong including, in fact, even pre-Novum. From a Spectrum standpoint, we're taking a point a year of share.

> And ***then, now that Novum's actually been introduced again with a feature set that's been really well received and a rollout process that's actually gone really well. In fact, again, I think one of the underappreciated pieces of that. We had that rollout in Canada for a while before we actually rolled it in the US. And so, there's a lot of opportunity to just work out any last kind of bugs and kinks in a way that's actually, had a really, again, a really smooth and impactful rollout of Novum here in the US***.
>
> And so, that has resulted in us being in a place where we -- the one point of share we're taking in Spectrum has translated into a couple of points of share in the year with Novum. We've got a number of really nice successes, both in terms of replacements with our existing customers as well as competitive wins. And ***so, we anticipate that trajectory continuing into next year. And I would say, probably even through the end of 2026, we expect a really solid replacement cycle in that space***.
>
> We also have introduced there a syringe pump. And obviously, that's new for us. But we actually have taken some nice share gains in that space as well, again, on a small base, because, again, it's a new introduction. But that's another area we've had some success and expect to continue to do. And ***so, again, that is a key driver from a growth standpoint for us next year and particularly obviously in our MPT segment***.

***February 20, 2025 Earnings Call***

165. On February 20, 2025, the Company hosted an earnings call to discuss with investors and analysts its financial results for the fourth quarter of 2024 and fiscal year 2024 (the "Q4 2024 Earnings Call"). During the Q4 2024 Earnings Call, Defendant Grade characterized the Novum LVP as a "resounding success" and major source of the Company's growth, stating the following:

> So, really, let me start with the fact that it's really across our portfolio where we actually have, again, really some innovation happening. And again, certainly, I would start with [ Heather's business and FPC ]. Obviously, ***the Novum pump has been a resounding success. It's a differentiated product that, again, has gotten a great customer response. The launch has gone extremely well***. Obviously, we got a partial year of that growth last year in 2024. We'll have a full year of that growth heading forward here in 2025.
>
> So, certainly ***Novum is obviously a huge key part of our innovation and again really a great success story***.

166. Also during the Q4 2024 Earnings Call, Defendant Knight conveyed her optimism in the Novum LVP, stating the following:

> So, ***we did see strengths across our infusion therapies business and the infusion pump platform*** in particular in the fourth quarter.
>
> ***So, I'll say we're very happy with the launch of Novum IQ and where we are. The teams are doing a great job driving this new platform. If you recall, Baxter placed a pretty big bet to internally develop a brand-new-to-market and novel infusion pump platform, both with the hardware, software and digital platform, and we're seeing it pay off***.
>
> So, our infusion business grew 50% last year in 2024. And we're expecting another great year this year in 2025. And it's not only important, because we get the revenue from the hardware and software, but also because we get to pull through very consistent revenue over the life of that pump. So, share cap, share competitive gains are really important, ***and customer satisfaction, right now, is very high***, both on the implementation of the pump as well as the EMR integration with the new platform. And this was developed in collaboration with our customers.
>
> So, again, we're starting to see the benefit of that. We took multiple points of market share last year in 2024 and we're expecting to see more of the same, more competitive gains in 2025. And then, we have some new complementary digital suites that are now launching that will be a great complement to this launch midyear in 2024.
>
> So, I'll tell you, ***I'm pretty excited about where we are in this new chapter, the new pace, momentum that we're building around the Novum platform***.

***February 21, 2025 Form 10-K***

167. On February 21, 2025, the Company filed its Annual Report on Form 10-K with the SEC reporting its financial results for the year ended December 31, 2024 (the "2024 10-K"). The 2024 10-K was signed by Defendants Shafer, Grade, Ampofo, Morrison, Oesterle, Rusckowski, Schlichting, Smith, Wendell, and Wilkes. The 2024 10-K included SOX certifications signed by Defendants Shafer and Grade certifying that the 2024 10-K "fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act]" and that the "information contained in the [2024 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company." The 2024 10-K contained substantively the same risk factors

referenced and identified in ¶110, *supra*. In addition, the 2024 10-K contained the following additional statement: "In addition, our customers' use of third parties to service or repair our products has caused, and may in the future cause, quality or safety issues, including due to such third parties' lack of knowledge of or training on our products."

***March 5, 2025 TD Cowen Conference***

168. On March 5, 2025, Defendant Grade represented the Company at the TD Cowen Conference. At the conference, Defendant Grade emphasized that the Novum LVP launch had been successful, stating the following:

> ***I think that the launch itself is something as a company, we're really proud of, and it has actually gone really well. And the product has been extremely well received***. The demand level is high. We're certainly in a replacement cycle for pumps. And so there's a lot of people selling pumps right now, and we're certainly one of them participating in that. We expect that replacement cycle to continue here for the next year, year and a half to 2 years.
>
> But I think the key part, back to your original ask, is this is something that as we sold our Spectrum pumps, we were taking share at a rate of about 1 point a year. We actually believe now that, with Novum, we've actually doubled that, Or we're taking a couple of points of share a year here. And the great thing for us is we got about a half a year out of that growth last year, and obviously, we'll now get a full year of it here in 2025.
>
> ***So feel good about that momentum. And then, of course, the good news of that is the pumps themselves are not necessarily margin accretive by themselves, but the sets and the other things that go with that is - has been something we've seen a lot of success in as well, and feeling really good about where we stand there***.

169. The statements in ¶¶151-168 above were materially false and misleading and failed to disclose, *inter alia*, that: (1) Baxter was engaging in the Product Safety Misconduct; (2) in light of the Company's inadequate remedial measures to address the Product Safety Misconduct, there was an increased likelihood that customers would stop using the Novum LVPs on patients; (3) as a result, the Company would halt the sale of the Novum LVP; and (4) the Company failed to

maintain internal controls. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

***2025 Proxy Statement***

170. On March 25, 2025, the Company filed the 2025 Proxy Statement with the SEC. The 2025 Proxy Statement was solicited by Defendants Ampofo, Morrison, Oesterle, Rusckowski, Schlichting, Shafer, Smith, Wendell, and Wilkes, pursuant to Section 14(a) of the Exchange Act, and contained materially false and misleading statements.

171. The 2025 Proxy Statement solicited shareholders to vote to, *inter alia*: (1) re-elect Defendants Ampofo, Morrison, Oesterle, Rusckowski, Schlichting, Shafer, Smith, Wendell, Wilkes and non-party Jeffrey A. Craig ("Craig") to serve as directors until the next annual meeting of stockholders; (2) approve, on an advisory basis, named executive officer compensation for 2024; (3) ratify the appointment of PricewaterhouseCoopers LLP as the independent registered public accounting firm for Baxter in 2025; and (4) approve the stockholder proposal relating to executives' retaining significant stock, if properly presented at the Annual Meeting of Baxter Stockholders.

172. With respect to the Code of Conduct, the 2025 Proxy Statement stated:

> Baxter has adopted a Code of Conduct that applies to all members of the Board and all employees of the company, including the CEO, CFO, Controller and other senior financial officers. Any amendment to, or waiver from, a provision of the Code of Conduct that applies to the CEO, CFO, Controller or persons performing similar functions will be disclosed on Baxter's website, at www.baxter.com under "Our Story—Our Governance—Corporate Governance Matters." The Code of Conduct is available on Baxter's website at www.baxter.com under "Our Story—Our Governance—Corporate Governance Matters—Code of Conduct." The full Board is responsible for overseeing compliance with the Code of Conduct and regular training on the Code of Conduct is provided to the Board and made available to employees, including senior management.

173. In a section titled "Board's Role in Risk Oversight," the 2025 Proxy Statement stated:

> The Board maintains broad oversight over risk management, including with respect to the company's strategic objectives and the risks identified by the company's Enterprise Risk Management (ERM) program. Baxter's ERM program is designed to identify, assess and prioritize strategic, financial, operational, regulatory and compliance, technological and reputational risks with the potential to have sustained impact on the company. While management has day-to-day responsibility for assessing and managing the company's risk exposure, the Board and its committees provide active oversight in connection with those efforts. Management regularly reports to the Board on global dynamics, challenges and opportunities facing the company and, at least annually, management reports to the Board on the company's ERM process and identified risks. The full Board also regularly oversees other areas of potential risk, such as significant acquisitions and divestitures and management succession planning, as further described below. The Board consults with internal and external advisors, as needed, to enable the Board to exercise its oversight responsibility for the company's risk management processes. Further, the Board and its committees receive updates and training from internal and external experts on topics that pertain to relevant areas of risk management. The Board's oversight of risk management is designed to support the achievement of the company's strategic and organizational objectives, improve long-term organizational performance and enhance stockholder value.
>
> The Board monitors key risks through review and discussion of related materials with company management and by delegating certain risk oversight responsibilities to its committees. The Board delegates risk oversight responsibility to its committees where it believes the committee's purpose and subject matter responsibilities, as set forth in each committee's charter, as well as the composition of the committee will support efficient and effective oversight. More specifically, and in addition to cybersecurity incident oversight as described below, the Audit Committee is charged with oversight of the process by which management assesses and manages financial risk as well as the steps taken to monitor and control these exposures. The QRC Committee is charged with oversight of Baxter's quality and regulatory compliance programs (inclusive of the quality and regulatory aspects of the company's research and development programs). The NCGPP Committee is responsible for overseeing and reviewing corporate governance matters (including director independence and Board composition) and corporate actions related to corporate citizenship and public policy, including current and emerging political issues. The CHC Committee oversees compensation policies and practices with respect to both executive compensation and compensation generally as well as certain human capital management matters. The full Board is kept abreast of risk oversight and other activities of its committees through reports of the committee chairs to the full Board during Board meetings.

174. Under the direction and watch of Defendants Ampofo, Morrison, Oesterle, Rusckowski, Schlichting, Shafer, Smith, Wendell, and Wilkes, the 2025 Proxy Statement was materially false and misleading and failed to disclose, *inter alia*, that: (1) Baxter was engaging in

the Product Safety Misconduct; (2) in light of the Company's inadequate remedial measures to address the Product Safety Misconduct, there was an increased likelihood that customers would stop using the Novum LVPs on patients; (3) as a result, the Company would halt the sale of the Novum LVP; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

175. The 2025 Proxy Statement also failed to disclose, *inter alia*, that: (1) although the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2025 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

176. As a result of the material misstatements and omissions contained in the 2025 Proxy Statement, Company shareholders voted to: (1) re-elect Defendants Ampofo, Morrison, Oesterle, Rusckowski, Schlichting, Shafer, Smith, Wendell, Wilkes and non-party Craig to serve as directors until the next annual meeting of stockholders; (2) approve, on an advisory basis, named executive officer compensation for 2024; and (3) ratify the appointment of PricewaterhouseCoopers LLP as the independent registered public accounting firm for Baxter in 2025.

**The Truth Begins to Emerge as the False and Misleading Statements Continue**

***April 7, 2025 News Report***

177. The truth began to emerge on April 7, 2025, when a Missouri news outlet covered a story regarding the Novum LVP and a whistleblower at BJC, a major hospital system based in St. Louis. As set forth above, the whistleblower stated, *inter alia*, that "patients should not be being

treated with these pumps. These pumps are not safe." As a result of the April 7, 2025 news report, BJC removed its Novum LVP devices from service. Nevertheless, the Individual Defendants continued to obfuscate the true nature of the Novum LVP's design defects and the impact of such defects on the Company's financial prospects.

***April 24, 2025 Warning Letter***

178. The truth continued to emerge on April 24, 2025 when the Company issued the April 2025 Letter regarding a potential risk of under infusion associated with the Novum LVP. However, the April 2025 Letter only disclosed one serious injury linked to the under infusion risk.

179. Nevertheless, the Individual Defendants continued to obfuscate the true nature of the Novum LVP's design defects and the impact of such defects on the Company's financial prospects. For instance, the April 2025 Letter stated that "customers can continue to use the Novum IQ LVP" and that the Company was "developing a software update" to resolve the product defect.

***May 1, 2025 Earnings Call***

180. On May 1, 2025, the Company hosted an earnings to discuss with investors and analysts its financial results for the first quarter of 2025 (the "Q1 2025 Earnings Call"). During the Q1 2025 Earnings Call, Defendant Knight touted the purportedly robust market performance of the Novum LVP and strong consumer enthusiasm for the same, stating the following:

> I'll tackle the first one, first question on Novum. So, the backlog and pipeline on Novum is strong. So yes, we have taken market share in the low single-digit range already. So there's good momentum in the Novum franchise. Not just for the launch, Novum has been in the market now less than a year, but also the innovation pipeline coming behind it. It's pretty robust and rich. ***So we're excited and our customers are excited about partnering with us around Novum***.
>
> ***A lot of the pumps in the market have been a decade plus old. So, we're bringing new technology to the market with smarter, more sophisticated capabilities on interoperability with digital suites that are going to follow to supplement that launch. So good momentum around Novum and happy with the progress***.

***May 6, 2025 Form 10-Q***

181. On May 6, 2025, the Company filed its quarterly report on Form 10-Q reporting its financial results for the first quarter of 2025 (the "Q1 2025 10-Q"). The Q1 2025 10-Q was signed by Defendant Grade and included SOX certifications signed by Defendants Shafer and Grade certifying that the Q1 2025 10-Q "fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act]" and that the "information contained in the [Q1 2025 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company." The Company stated in the Q1 2025 10-Q that "we do not believe there have been any material changes to the risk factors previously disclosed in our [2024 10-K]." The 2024 10-K contained substantively the same risk factors referenced and identified in ¶110, *supra*.

***June 6, 2025 FDA Recall***

182. The truth continued to emerge on June 6, 2025 when the FDA issued the June 2025 Recall. As discussed in further detail above, the FDA explained in the June 2025 Recall notice that, according to the Company, the Novum LVP could deliver less medication than intended if left in standby mode for more than 2 hours and 30 minutes or powered off with the infusion set still loaded.

183. Nevertheless, the Individual Defendants continued to obfuscate the true nature of the Novum LVP's design defects and the impact of such defects on the Company's financial prospects.

***June 10, 2025 Goldman Sachs Conference***

184. On June 10, 2025, Defendant Grade represented the Company at the Goldman Sachs Conference. Despite the issuance of the June 2025 Recall, the Individual Defendants continued to tout to investors the purportedly promising launch of the Novum LVP and the products' satisfactory performance. For instance, at the Goldman Sachs Conference, Defendant

Grade stated that there was "***certainly continued progress from Novum***. We've had a strong growth in our pump sales, and so that continues to be a drive." Defendant Grade added that "***from a Novum perspective, we certainly – again, that launch has gone really well. The product is performing really well.*** We are in an upgrade cycle that is causing lots of customers to be able to have conversations about those things."

***July 14, 2025 Warning Letter***

185. The truth continued to emerge on July 14, 2025 when the Company issued the July 2025 Letter which re-emphasized the risk of under infusion associated with the Novum LVP in addition to noting the risk of over infusion associated with the Novum LVP. The July 2025 Letter stated that under infusion could occur when flow rates increase from a low baseline to a high second rate (including when no fluid is delivered). Moreover, the July 2025 Letter noted that between June 2023 and May 2025, the Company received ***seventy-nine reports of serious injury and two deaths*** in relation to the defects noted above. Nevertheless, the Company did not instruct customers to remove the Novum LVP from service but instead instructed customers to follow mitigation steps and stated that it would provide software updates to correct the product defects.

***July 22, 2025 FDA Recall***

186. On June 22, 2025, the FDA issued the July 2025 Recall based on the contents of the July 2025 Letter. The July 2025 Recall notice reiterated the risk of under infusion in the Novum LVP when transitioning from low flow rates to significantly higher rates as well as the risks of over infusion and complete non-delivery associated with the device.

187. The statements in ¶¶178-181 and ¶¶184-185 above were materially false and misleading and failed to disclose, *inter alia*, that: (1) Baxter was engaging in the Product Safety Misconduct; (2) in light of the Company's inadequate remedial measures to address the Product

Safety Misconduct, there was an increased likelihood that customers would stop using the Novum LVPs on patients; (3) as a result, the Company would halt the sale of the Novum LVP; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

**The Truth Emerges**

***July 31, 2025 Press Release***

188. The truth finally emerged on July 31, 2025, when the Company issued the July 2025 Press Release. The July 2025 Press Release revealed that the Company had decided to "***voluntarily and temporarily pause shipments and planned installations of the Novum LVP***" and, further, that Baxter was ""unable to currently commit to an exact timing for resuming shipment and installation for Novum IQ LVPs." The July 2025 Press Release also noted that the Company had provided "customers the option of our Spectrum infusion pump as an alternative" and that Baxter's low-end guidance assumes that the Company does not resume shipments for Novum LVPs before the end of the year.

189. The July 2025 Press Release came as a shock to analysts, such as those with Wells Fargo and JPMorgan. For instance, Wells Fargo analysts reported that "while we have seen the FDA alert relating to under-infusion risk associated w/ Novum, ***the sales pause came as a surprise***." Analysts with JPMorgan similarly noted that it was "disappointing to see Baxter taking two steps back" and that "***it's hard not to be disappointed***" as the Company's "***voluntary recall of Novum make[s] it even more difficult to underwrite management's previously stated revenue growth targets***."

190. On this news, the price per share of the Company's common stock fell $6.29, or

roughly 22.4%, from a closing price of $28.05 per share on July 30, 2025 to close at $21.76 per share on July 31, 2025.

## REPURCHASES DURING THE RELEVANT PERIOD

191. During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the Company spent an aggregate amount of approximately $32.4 million to repurchase 500,000 shares of its own common stock at artificially inflated prices from February 2022 through July 2025.

192. According to the Q2 2022 10-Q, between June 1, 2022 and June 30, 2022, the Company repurchased 125,000 shares of its own common stock at an average price per share of $64.91, for a total cost to the Company of roughly $8.1 million.

193. As the Company's stock was actually worth only $21.76, the price at closing on July 31, 2025, the Company overpaid by approximately $5.4 million for repurchases of its own stock between June 1, 2022 and June 30, 2022.

194. According to the Q3 2022 10-Q, between July 1, 2022 and July 31, 2022, the Company repurchased 375,000 shares of its own common stock at an average price per share of $64.80, for a total cost to the Company of roughly $24.3 million.

195. As the Company's stock was actually worth only $21.76, the price at closing on July 31, 2025, the Company overpaid by approximately $16.1 million for repurchases of its own stock between July 1, 2022 and July 31, 2022.

196. Thus, in total, during the Relevant Period, the Company overpaid for repurchases of its own stock by approximately $21.5 million.

## DAMAGES TO BAXTER

197. As a direct and proximate result of the Individual Defendants' conduct, Baxter will

lose and expend many millions of dollars.

198. Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company; its former President, CEO and Chairman of the Board; its interim CEO and Chairman of the Board; its CFO, its former interim CFO and CAO; its former CFO; its former COO; and its Vice President of Investor Relations, any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

199. Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

200. Such expenditures also include, but are not limited to, the cost of implementing measures to remediate the Product Safety Misconduct.

201. Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

202. Such losses include any costs associated with the FDA's recalls of the Novum LVP as set forth herein.

203. Such losses include the Company's overpayment of over $21.5 million for repurchases of its own stock during the period when the Company's stock price was artificially inflated due to the false and misleading statements discussed above.

204. Additionally, these expenditures include, but are not limited to, excessive

compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, including lucrative insider trading conducted by five of the Individual Defendants.

205. As a direct and proximate result of the Individual Defendants' conduct, Baxter has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

206. Plaintiff brings this action derivatively and for the benefit of Baxter to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Baxter, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act.

207. Baxter is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

208. Plaintiff is, and has been at all relevant times, a shareholder of Baxter. Plaintiff will adequately and fairly represent the interests of Baxter in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

209. Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

210. A pre-suit demand on the Board of Baxter is futile and, therefore, excused. At the

time of filing of this action, the Board consists of the following eleven individuals: Defendants Shafer, Ampofo, Morrison, Oesterle, Rusckowski, Schlichting, Smith, Wendell, Wilkes (the "Director-Defendants") and non-parties Andrew Hider ("Hider") and Craig (collectively with the Directo-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to six of the eleven Directors who are on the Board at the time this action is commenced.

211. Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the schemes they engaged in knowingly or recklessly to participate in and/or cause the Company to participate in the Product Safety Misconduct and to make and/or cause the Company to make false and misleading statements and omissions of material facts, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the schemes.

212. In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein and participated in and/or caused the Company to participate in the Product Safety Misconduct. The fraudulent schemes were intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

213. In addition, the nine Director-Defendants, in soliciting the false and misleading 2024 Proxy Statement, caused shareholders to vote to approve the Amended 2021 Plan which, *inter alia*, increased "the aggregate number of shares of common stock authorized for issuance by 40,000,000." As of December 31, 2024, roughly 48.1 million shares of common stock remained

available for purchase under the Amended 2021 Plan. Thus, the Individual Defendants, including the Director-Defendants, were provided the opportunity to receive material personal benefits in the future pursuant to the Amended 2021 Plan. For these reasons too, demand on the Director-Defendants is futile, and therefore, excused.

214. Additional reasons that demand on non-party Hider is futile follow. Non-party Hider is neither disinterested nor independent, and therefore, is incapable of considering demand because he, as the Company's President and CEO, is an employee of the Company, and thus derives substantially all of his income from his employment with Baxter, thereby rendering him not independent. As such, non-party Hider could not objectively and disinterestedly consider a demand to sue the Individual Defendants, and any demand upon non-party Hider is therefore futile.

215. Additional reasons that demand on Defendant Shafer is futile follow. Defendant Shafer has served as a Company director since May 10, 2022. Additionally, Defendant Shafer has served as the Chairman of the Board since May 3, 2022, and currently serves as a member of the Audit Committee and as a member of the Nominating, Corporate Governance, and Public Policy Committee. Moreover, Defendant Shafer served as the Company's interim CEO from February 3, 2025 to September 3, 2025. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the schemes to participate in the Product Safety Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Shafer signed the materially false and misleading 2022 10-K, 2023 10-K, and 2024 10-K, as well as the SOX certifications associated with the 2024 10-K that are referenced herein. Defendant Shafer solicited the 2023 Proxy Statement, which contained material misrepresentations and omissions and contributed to, *inter alia*, the re-election

of himself and Defendants Almeida, Morrison, Oesterle, Schlichting, Smith, Wendell, Wilkes, Wilver and non-party Mahoney to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Defendant Shafer also solicited the 2024 Proxy Statement, which contained material misrepresentations and omissions and contributed to, *inter alia*, the re-election of himself and Defendants Almeida, Ampofo, Morrison, Oesterle, Rusckowski, Schlichting, Smith, Wendell, Wilkes, and Wilver to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Further, Defendant Shafer solicited the 2025 Proxy Statement, which contained material misrepresentations and omissions and contributed to, *inter alia*, the re-election of himself and Defendants Ampofo, Morrison, Oesterle, Rusckowski, Schlichting, Smith, Wendell, Wilkes and non-party Craig to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Additionally, Defendant Shafer is named as a defendant in the Securities Class Action. For these reasons, Defendant Shafer breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

216. Additional reasons that demand on Defendant Ampofo is futile follow. Defendant Ampofo has served as a Company director since June 29, 2023. Defendant Ampofo also serves as a member of the Quality and Regulatory Compliance Committee and as a member of the Operating Committee. He has received and continues to receive handsome compensation for his role at the Company. As a trusted, long-time Company director, he conducted little, if any, oversight of the Company's engagement in the schemes to participate in the Product Safety Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Defendant Ampofo signed the materially false and misleading 2023 and 2024 10-

Ks. Defendant Ampofo also solicited the 2024 Proxy Statement, which contained material misrepresentations and omissions and contributed to, *inter alia*, the re-election of himself and Defendants Almeida, Morrison, Oesterle, Rusckowski, Schlichting, Shafer, Smith, Wendell, Wilkes, and Wilver to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Further, Defendant Ampofo solicited the 2025 Proxy Statement, which contained material misrepresentations and omissions and contributed to, *inter alia*, the re-election of himself and Defendants Morrison, Oesterle, Rusckowski, Schlichting, Shafer, Smith, Wendell, Wilkes and non-party Craig to the Board, thereby allowing to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Ampofo breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

217. Additional reasons that demand on Defendant Morrison is futile follow. Defendant Morrison has served as a Company director since 2019. Defendant Morrison currently serves as a member of the Audit Committee, as a member of the Nominating, Corporate Governance and Public Policy Committee, and as a member of the Operating Committee. She has received and continues to receive handsome compensation for her role at the Company. As a trusted, long-time Company director, she conducted little, if any, oversight of the Company's engagement in the schemes to participate in the Product Safety Misconduct and to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. Additionally, Defendant Morrison signed the materially false and misleading 2021, 2022, 2023, and 2024 10-Ks. Defendant Morrison solicited the 2023 Proxy Statement, which contained material misrepresentations and omissions and contributed to, *inter alia*, the re-election of herself

and Defendants Almeida, Oesterle, Schlichting, Shafer, Smith, Wendell, Wilkes, Wilver and non-party Mahoney to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Defendant Morrison also solicited the 2024 Proxy Statement, which contained material misrepresentations and omissions and contributed to, *inter alia*, the re-election of herself and Defendants Almeida, Ampofo, Oesterle, Rusckowski, Schlichting, Shafer, Smith, Wendell, Wilkes, and Wilver to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Defendant Morrison also solicited the 2025 Proxy Statement, which contained material misrepresentations and omissions and contributed to, *inter alia*, the re-election of herself and Defendants Ampofo, Oesterle, Rusckowski, Schlichting, Shafer, Smith, Wendell, Wilkes and non-party Craig to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Morrison breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

218. Additional reasons that demand on Defendant Oesterle is futile follow. Defendant Oesterle has served as a Company director since 2017 and currently serves as the Chair of the Quality and Regulatory Compliance Committee. Defendant Oesterle also currently serves as a member of the Nominating, Corporate Governance and Public Policy Committee. He has received and continues to receive handsome compensation for his role at the Company. As a trusted, long-time Company director, he conducted little, if any, oversight of the Company's engagement in the schemes to participate in the Product Safety Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Defendant Oesterle signed the materially false and misleading 2021, 2022, 2023, and 2024 10-Ks.

Defendant Oesterle also solicited the 2023 Proxy Statement, which contained material misrepresentations and omissions and contributed to, *inter alia*, the re-election of himself and Defendants Almeida, Morrison, Schlichting, Shafer, Smith, Wendell, Wilkes, Wilver and non-party Mahoney to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Defendant Oesterle solicited the 2024 Proxy Statement, which contained material misrepresentations and omissions and contributed to, *inter alia*, the re-election of himself and Defendants Almeida, Ampofo, Morrison, Rusckowski, Schlichting, Shafer, Smith, Wendell, Wilkes, and Wilver to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Defendant Oesterle also solicited the 2025 Proxy Statement, which contained material misrepresentations and omissions and contributed to, *inter alia*, the re-election of himself and Defendants Ampofo, Morrison, Rusckowski, Schlichting, Shafer, Smith, Wendell, Wilkes and non-party Craig to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Oesterle breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

219. Additional reasons that demand on Defendant Rusckowski is futile follow. Defendant Rusckowski has served as a Company director since August 21, 2023 and currently serves as the Chair of the Operating Committee. Defendant Rusckowski also currently serves as a member of the Compensation and Human Capital Committee and as a member of the Quality and Regulatory Compliance Committee. He has received and continues to receive handsome compensation for his role at the Company. As a trusted, long-time Company director, he conducted little, if any, oversight of the Company's engagement in the schemes to participate in the Product Safety Misconduct and to make false and misleading statements, consciously disregarded his

duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Additionally, Defendant Rusckowski signed the materially false and misleading 2023 and 2024 10-Ks. Defendant Rusckowski also solicited the 2024 Proxy Statement, which contained material misrepresentations and omissions and contributed to, *inter alia*, the re-election of himself and Defendants Almeida, Ampofo, Morrison, Oesterle, Schlichting, Shafer, Smith, Wendell, Wilkes, and Wilver to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Defendant Rusckowski also solicited the 2025 Proxy Statement, which contained material misrepresentations and omissions and contributed to, *inter alia*, the re-election of himself and Defendants Ampofo, Morrison, Oesterle, Schlichting, Shafer, Smith, Wendell, Wilkes and non-party Craig to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Rusckowski breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

220. Additional reasons that demand on Defendant Schlichting is futile follow. Defendant Schlichting has served as a Company director since 2021 and currently serves as the Chair of the Compensation and Human Capital Committee. Defendant Schlichting also currently serves as a member of the Quality and Regulatory Compliance Committee. She has received and continues to receive handsome compensation for her role at the Company. As a trusted, long-time Company director, she conducted little, if any, oversight of the Company's engagement in the schemes to participate in the Product Safety Misconduct and to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. Additionally, Defendant Schlichting signed the materially false and misleading 2021, 2022, 2023,

and 2024 10-Ks. Defendant Schlichting also solicited the 2023 Proxy Statement, which contained material misrepresentations and omissions and contributed to, *inter alia*, the re-election of herself and Defendants Almeida, Morrison, Oesterle, Shafer, Smith, Wendell, Wilkes, Wilver and non-party Mahoney to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Defendant Morrison solicited the 2024 Proxy Statement, which contained material misrepresentations and omissions and contributed to, *inter alia*, the re-election of herself and Defendants Almeida, Ampofo, Morrison, Oesterle, Rusckowski, Shafer, Smith, Wendell, Wilkes, and Wilver to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Defendant Schlichting also solicited the 2025 Proxy Statement, which contained material misrepresentations and omissions and contributed to, *inter alia*, the re-election of herself and Defendants Ampofo, Morrison, Oesterle, Rusckowski, Shafer, Smith, Wendell, Wilkes and non-party Craig to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Schlichting breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

221. Additional reasons that demand on Defendant Smith is futile follow. Defendant Smith has served as a Company director since 2017 and currently serves as the Chair of the Nominating, Corporate Governance and Public Policy Committee. Defendant Smith also currently serves as a member of the Audit Committee. She has received and continues to receive handsome compensation for her role at the Company. As a trusted, long-time Company director, she conducted little, if any, oversight of the Company's engagement in the schemes to participate in the Product Safety Misconduct and to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the schemes,

and consciously disregarded her duties to protect corporate assets. Additionally, Defendant Smith signed the materially false and misleading 2021, 2022, 2023, and 2024 10-Ks. Defendant Smith also solicited the 2023 Proxy Statement, which contained material misrepresentations and omissions and contributed to, *inter alia*, the re-election of herself and Defendants Almeida, Morrison, Oesterle, Schlichting, Shafer, Wendell, Wilkes, Wilver and non-party Mahoney to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Defendant Smith solicited the 2024 Proxy Statement, which contained material misrepresentations and omissions and contributed to, *inter alia*, the re-election of herself and Defendants Almeida, Ampofo, Morrison, Oesterle, Rusckowski, Schlichting, Shafer, Wendell, Wilkes, and Wilver to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Defendant Smith also solicited the 2025 Proxy Statement, which contained material misrepresentations and omissions and contributed to, *inter alia*, the re-election of herself and Defendants Ampofo, Morrison, Oesterle, Rusckowski, Schlichting, Shafer, Wendell, Wilkes and non-party Craig to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Smith breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

222. Additional reasons that demand on Defendant Wendell is futile follow. Defendant Wendell has served as a Company director since 2019 and currently serves as a member of the Compensation and Human Capital Committee. Defendant Wendell also currently serves as a member of the Quality and Regulatory Compliance Committee and as a Member of the Operating Committee. She has received and continues to receive handsome compensation for her role at the Company. As a trusted, long-time Company director, she conducted little, if any, oversight of the

Company's engagement in the schemes to participate in the Product Safety Misconduct and to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. Additionally, Defendant Wendell signed the materially false and misleading 2021, 2022, 2023, and 2024 10-Ks. Defendant Wendell solicited the 2023 Proxy Statement, which contained material misrepresentations and omissions and contributed to, *inter alia*, the re-election of herself and Defendants Almeida, Morrison, Oesterle, Schlichting, Shafer, Smith, Wilkes, Wilver and non-party Mahoney to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Defendant Wendell also solicited the 2024 Proxy Statement, which contained material misrepresentations and omissions and contributed to, *inter alia*, the re-election of herself and Defendants Almeida, Ampofo, Morrison, Oesterle, Rusckowski, Schlichting, Shafer, Smith, Wilkes, and Wilver to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Defendant Wendell also solicited the 2025 Proxy Statement, which contained material misrepresentations and omissions and contributed to, *inter alia*, the re-election of herself and Defendants Ampofo, Morrison, Oesterle, Rusckowski, Schlichting, Shafer, Smith, Wilkes and non-party Craig to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Wendell breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

223. Additional reasons that demand on Defendant Wilkes is futile follow. Defendant Wilkes has served as a Company director since 2021 and currently serves as a member of the Nominating, Corporate Governance and Public Policy Committee. Defendant Wilkes also currently serves as a member of the Quality and Regulatory Compliance Committee. He has

received and continues to receive handsome compensation for his role at the Company. As a trusted, long-time Company director, he conducted little, if any, oversight of the Company's engagement in the schemes to participate in the Product Safety Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Additionally, Defendant Wilkes signed the materially false and misleading 2021, 2022, 2023, and 2024 10-Ks. Defendant Wilkes solicited the 2023 Proxy Statement, which contained material misrepresentations and omissions and contributed to, *inter alia*, the re-election of himself and Defendants Almeida, Morrison, Oesterle, Schlichting, Shafer, Smith, Wendell, Wilver and non-party Mahoney to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Defendant Wilkes solicited the 2024 Proxy Statement, which contained material misrepresentations and omissions and contributed to, *inter alia*, the re-election of himself and Defendants Almeida, Ampofo, Morrison, Oesterle, Rusckowski, Schlichting, Shafer, Smith, Wendell, and Wilver to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Defendant Wilkes also solicited the 2025 Proxy Statement, which contained material misrepresentations and omissions and contributed to, *inter alia*, the re-election of himself and Defendants Ampofo, Morrison, Oesterle, Rusckowski, Schlichting, Shafer, Smith, Wendell and non-party Craig to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Wilkes breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

224. Additional reasons that demand on the Board is futile follow.

225. Defendants Morrison and Smith (the "Audit Committee Defendants") served as

members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the Product Safety Misconduct and in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Audit Committee Charter. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

226. In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' schemes to cause the Company to engage in the Product Safety Misconduct and to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In further violation of the Code of Conduct, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

227. Baxter has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against

themselves or any others who were responsible for that wrongful conduct to attempt to recover for Baxter any part of the damages Baxter suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

228. The Director-Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

229. The acts complained of herein constitute violations of fiduciary duties owed by Baxter's officers and directors, and these acts are incapable of ratification.

230. The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Baxter. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, inter alia, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Baxter, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action

is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

231. If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Baxter to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

232. Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least six of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

**FIRST CLAIM**
**Against the Individual Defendants for Violations of Section 14(a) of the Securities Exchange Act of 1934**

233. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

234. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

235. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or

which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

236. Under the direction and watch of Defendants Almeida, Morrison, Oesterle, Schlichting, Shafer, Smith, Wendell, Wilkes, and Wilver, the 2023 Proxy Statement failed to disclose that: (1) Baxter was engaging in the Product Safety Misconduct; (2) in light of the Company's inadequate remedial measures to address the Product Safety Misconduct, there was an increased likelihood that customers would stop using the Novum LVPs on patients; (3) as a result, the Company would halt the sale of the Novum LVP; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

237. Under the direction and watch of Defendants Almeida, Morrison, Oesterle, Schlichting, Shafer, Smith, Wendell, Wilkes, and Wilver, the 2023 Proxy Statement also failed to disclose, *inter alia*, that: (1) although the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2023 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

238. In the exercise of reasonable care, Defendants Almeida, Morrison, Oesterle, Schlichting, Shafer, Smith, Wendell, Wilkes, and Wilver should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2023 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the

2023 Proxy Statement, including, but not limited to, the re-election of the Company's directors.

239. As a result of the material misstatements and omissions contained in the 2023 Proxy Statement, Company shareholders voted to, *inter alia*, (1) re-elect Defendants Almeida, Morrison, Oesterle, Schlichting, Shafer, Smith, Wendell, Wilkes, Wilver and non-party Michael F. Mahoney to serve as directors until the next annual meeting of stockholders; (2) approve, on an advisory basis, named executive officer compensation for 2022; (3) approve, on an advisory basis, the frequency of executive compensation advisory votes; and (4) ratify the appointment of PricewaterhouseCoopers LLP as the independent registered public accounting firm for Baxter in 2023.

240. The Company was damaged as a result of Defendants Almeida's, Morrison's, Oesterle's, Schlichting's, Shafer's, Smith's, Wendell's, Wilkes', and Wilver's material misrepresentations and omissions in the 2023 Proxy Statement.

241. Under the direction and watch of Defendants Almeida, Ampofo, Morrison, Oesterle, Rusckowski, Schlichting, Shafer, Smith, Wendell, Wilkes, and Wilver, the 2024 Proxy Statement failed to disclose that: (1) Baxter was engaging in the Product Safety Misconduct; (2) in light of the Company's inadequate remedial measures to address the Product Safety Misconduct, there was an increased likelihood that customers would stop using the Novum LVPs on patients; (3) as a result, the Company would halt the sale of the Novum LVP; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

242. Under the direction and watch of Defendants Almeida, Ampofo, Morrison, Oesterle, Rusckowski, Schlichting, Shafer, Smith, Wendell, Wilkes, and Wilver, the 2024 Proxy Statement also failed to disclose, *inter alia*, that: (1) although the Company claimed its officers

and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2024 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

243. In the exercise of reasonable care, Defendants Almeida, Ampofo, Morrison, Oesterle, Rusckowski, Schlichting, Shafer, Smith, Wendell, Wilkes, and Wilver should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2024 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2024 Proxy Statement, including, but not limited to, the re-election of the Company's directors.

244. As a result of the material misstatements and omissions contained in the 2024 Proxy Statement, Company shareholders voted to, *inter alia*, (1) re-elect Defendants Almeida, Ampofo, Morrison, Oesterle, Rusckowski, Schlichting, Shafer, Smith, Wendell, Wilkes, and Wilver to serve as directors until the next annual meeting of stockholders; (2) approve, on an advisory basis, named executive officer compensation for 2023; (3) ratify the appointment of PricewaterhouseCoopers LLP as the independent registered public accounting firm for Baxter in 2024; (4) approve the Company's Amended and Restated 2021 Incentive Plan; and (5) approve an amendment to the Amended and Restated Certificate of Incorporation to permit officer exculpation.

245. The Company was damaged as a result of Defendants Almeida's, Ampofo's Morrison's, Oesterle's, Rusckowski's, Schlichting's, Shafer's, Smith's, Wendell's, Wilkes', and Wilver's material misrepresentations and omissions in the 2024 Proxy Statement.

246. Under the direction and watch of Defendants Ampofo, Morrison, Oesterle, Rusckowski, Schlichting, Shafer, Smith, Wendell, and Wilkes, the 2025 Proxy Statement failed to disclose that: (1) Baxter was engaging in the Product Safety Misconduct; (2) in light of the Company's inadequate remedial measures to address the Product Safety Misconduct, there was an increased likelihood that customers would stop using the Novum LVPs on patients; (3) as a result, the Company would halt the sale of the Novum LVP; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

247. Under the direction and watch of Defendants Ampofo, Morrison, Oesterle, Rusckowski, Schlichting, Shafer, Smith, Wendell, and Wilkes, the 2025 Proxy Statement also failed to disclose, *inter alia*, that: (1) although the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2025 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

248. In the exercise of reasonable care, Defendants Ampofo, Morrison, Oesterle, Rusckowski, Schlichting, Shafer, Smith, Wendell, and Wilkes should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2025 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2025 Proxy Statement, including, but not limited to, the re-election of the Company's directors.

249. As a result of the material misstatements and omissions contained in the 2025 Proxy

Statement, Company shareholders voted to, *inter alia*, (1) re-elect Defendants Ampofo, Morrison, Oesterle, Rusckowski, Schlichting, Shafer, Smith, Wendell, Wilkes and non-party Craig to serve as directors until the next annual meeting of stockholders; (2) approve, on an advisory basis, named executive officer compensation for 2024; and (3) ratify the appointment of PricewaterhouseCoopers LLP as the independent registered public accounting firm for Baxter in 2025.

250. The Company was damaged as a result of Defendants Ampofo's, Morrison's, Oesterle's, Rusckowski's, Schlichting's, Shafer's, Smith's, Wendell's, and Wilkes' material misrepresentations and omissions in the 2025 Proxy Statement.

251. Plaintiff, on behalf of Baxter, has no adequate remedy at law.

**SECOND CLAIM**
**Against the Individual Defendants for Violations of Section 20(a) of the Securities Exchange Act of 1934**

252. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

253. The Individual Defendants, by virtue of their positions with Baxter and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Baxter and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause Baxter to engage in the illegal conduct and practices complained of herein.

254. Plaintiff, on behalf of Baxter, has no adequate remedy at law.

**THIRD CLAIM**
**Against the Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934**

255. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

256. The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding Baxter. Not only is Baxter now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful schemes perpetrated upon Baxter by the Individual Defendants. With the price of its common stock trading at artificially-inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase thousands of its own shares at artificially-inflated prices, damaging Baxter.

257. During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements, and periodic and current reports filed with the SEC.

258. The Individual Defendants employed devices, schemes, and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Baxter not misleading.

259. The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Baxter.

260. The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to

ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

261. By virtue of the foregoing, the Individual Defendants have violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

262. Plaintiff, on behalf of Baxter, has no adequate remedy at law.

**FOURTH CLAIM**
**Against the Individual Defendants for Breach of Fiduciary Duties**

263. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

264. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Baxter's business and affairs.

265. Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

266. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Baxter.

267. In breach of their fiduciary duties owed to Baxter, the Individual Defendants participated in and/or caused the Company to participate in the Product Safety Misconduct.

268. In breach of their fiduciary duties owed to Baxter, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) Baxter was engaging in the Product Safety Misconduct; (2) in light of the Company's inadequate remedial

measures to address the Product Safety Misconduct, there was an increased likelihood that customers would stop using the Novum LVPs on patients; (3) as a result, the Company would halt the sale of the Novum LVP; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

269. In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, which renders them personally liable to the Company for breaching their fiduciary duties.

270. Also, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

271. In yet further breach of their fiduciary duties, during the Relevant Period, five of the Individual Defendants engaged in lucrative insider sales, netting combined total proceeds of over $3.6 million.

272. The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Baxter's securities.

273. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to

maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Baxter's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

274. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

275. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Baxter has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

276. Plaintiff, on behalf of Baxter, has no adequate remedy at law.

**FIFTH CLAIM**
**Against the Individual Defendants for Unjust Enrichment**

277. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

278. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Baxter.

279. The Individual Defendants either benefitted financially from the improper conduct or received bonuses, stock options, or similar compensation from Baxter that was tied to the performance or artificially inflated valuation of Baxter, or received compensation that was unjust

in light of the Individual Defendants' bad faith conduct. This includes lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

280. Plaintiff, as a shareholder and a representative of Baxter, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

281. Plaintiff, on behalf of Baxter, has no adequate remedy at law.

**SIXTH CLAIM**
**Against the Individual Defendants for Abuse of Control**

282. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

283. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Baxter, for which they are legally responsible.

284. As a direct and proximate result of the Individual Defendants' abuse of control, Baxter has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

285. Plaintiff, on behalf of Baxter, has no adequate remedy at law.

**SEVENTH CLAIM**
**Against the Individual Defendants for Gross Mismanagement**

286. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

287. By their actions alleged herein, the Individual Defendants, either directly or through

aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Baxter in a manner consistent with the operations of a publicly held corporation.

288. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Baxter has sustained and will continue to sustain significant damages.

289. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

290. Plaintiff, on behalf of Baxter, has no adequate remedy at law.

**EIGHTH CLAIM**
**Against the Individual Defendants for Waste of Corporate Assets**

291. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

292. The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

293. The Individual Defendants also caused the Company to repurchase its own shares at artificially inflated prices, thereby wasting the Company's assets.

294. As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Baxter to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

295. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

296. Plaintiff, on behalf of Baxter, has no adequate remedy at law.

**NINTH CLAIM**

**Against Defendants Almeida, Shafer, Grade, Saccaro, Stevens, Knight, and Trachtman for Contribution Under Sections 10(b) and 21D of the Securities Exchange Act of 1934**

297. Plaintiff incorporates by reference and reallege each and every allegation set forth above, as though fully set forth herein.

298. Baxter, Defendant Almeida, Defendant Shafer, Defendant Grade, Defendant Saccaro, Defendant Stevens, Defendant Knight, and Defendant Trachtman are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Almeida's, Shafer's, Grade's, Saccaro's, Stevens', Knight's, and Trachtman's willful and/or reckless violations of their obligations as officers and/or directors of Baxter.

299. Defendants Almeida, Shafer, Grade, Saccaro, Stevens, Knight, and Trachtman, because of their various positions of control and authority within the Company, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Baxter, including the wrongful acts complained of herein and in the Securities Class Action.

300. Accordingly, Defendants Almeida, Shafer, Grade, Saccaro, Stevens, Knight, and Trachtman are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

301. As such, Baxter is entitled to receive all appropriate contribution or indemnification from Defendants Almeida, Shafer, Grade, Saccaro, Stevens, Knight, and Trachtman.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a) Declaring that Plaintiff may maintain this action on behalf of Baxter, and that Plaintiff is an adequate representative of the Company;

(b) Declaring that each of the Individual Defendants have breached or aided and abetted the breach of their fiduciary duties to Baxter;

(c) Determining and awarding to Baxter the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d) Directing Baxter and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Baxter and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Baxter to nominate at least six candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e) Awarding Baxter restitution from Individual Defendants, and each of them;

(f) Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g) Granting such other and further relief as the Court may deem just and proper.

Dated: November 13, 2025

Respectfully submitted,

*/s/ Timothy Brown*
Timothy Brown
**THE BROWN LAW FIRM, P.C.**
767 Third Avenue, Suite 2501
New York, NY 10017
Tel: (516) 922-5427
Fax: (516) 344-6204
tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

**VERIFICATION**

I, Ryan Wood, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 12__ day of November, 2025.

Signed by:

9CEFA56A5B9E404...

Ryan Wood